## MILK AND ICE CREAM CAN INSTITUTE et al. v. FEDERAL TRADE COMMISSION.

No. 8460.

Circuit Court of Appeals, Seventh Circuit.

Jan. 7, 1946.

Frederick C. Nash, of Detroit, Mich., William B. Paul, of Pittsburgh, Pa., Guy George Gabrielson, of New York City (Albert L. Wolfe, of New York City, of counsel), Spencer Gordon and Virginia C. Duncombe, both of Washington, D. C., Bodman Longley, Bogle, Middleton & Armstrong, of Detroit, Mich., Alfred W. Craven, of Chicago, Ill., Archibald Douglas, Edward Holloway and Douglas, Armitage & Holloway, all of New York City (Paul Armitage, of New York City, of counsel), for petitioners.

William T. Kelley, Chief Counsel, and Walter B. Wooden, Asst. Chief Counsel, both of Washington, D. C., for respondent.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

This is a petition to review a cease and desist order entered by the Federal Trade Commission on September 18, 1943. Petitioners are the Milk and Ice Cream Can Institute, an unincorporated trade association (hereinafter referred to as the Institute), D. S. Hunter, secretary of the In-

stitute (sometimes referred to as the commissioner), and the following corporate members: Buhl Stamping Company located at Detroit, Michigan; The Creamery Package Manufacturing Company located at Chicago, Illinois; Sheet Metal Specialty Company located at Follansbee, West Virginia; Atlantic Stamping Company located at Rochester, New York; Keiner Williams Stamping Company located at Richmond Hill in Long Island (a suburb of New York City); Superior Metal Products Company located at St. Paul, Minnesota; and Solar-Sturges Manufacturing Company located at Melrose Park, Illinois (a suburb of Chicago). Three separate briefs have been filed by the petitioners, one on behalf of the Institute, Hunter and the first three corporate petitioners just named, another on behalf of the next three corporate petitioners, and another on behalf of the last named corporate petitioner.

The Institute has been in existence since 1930, the year of its organization. Hunter has acted as its secretary or commissioner from the beginning, and all of the corporate petitioners have been members during such period. All of the corporate petitioners are and have long been engaged in the manufacture, sale and distribution of milk cans and ice cream cans, with the exception of Atlantic Stamping Company which does not manufacture ice cream cans. The seven corporate petitioners, together with Lalance & Grosjean Corporation, a former member of the Institute against whom the proceeding was dismissed by the Commission, and Geuder, Paeschke and Frey Company (a party to the proceeding before the Commission but who has not petitioned for review), manufacture practically all of the milk and ice cream cans sold and distributed in the United States.

The complaint issued by the Commission alleged that the corporate members of the Institute had maintained an unlawful combination to restrain competition in the manufacture, sale and distribution of milk and ice cream cans in interstate commerce; that they had "cooperatively made and announced prices" in such a manner that the delivered cost of their products to a purchaser was the same regardless of the producing point; that as a part of such combination the corporate members had by agreement employed a freight equalization plan; that they had provided themselves with a compilation of freight rate factors; that they had exchanged details of sales with each other; that they had maintained a systematic check upon each other for the purpose of curtailing and eliminating allowances; that they had agreed to discounts and other terms and conditions of sale, and that they had standardized and promoted uniformity in their products for the purpose of lessening competition. It was alleged that the Institute and Hunter had cooperated in the activities of the members. It was further alleged that such acts restrained commerce and constituted unfair acts and practices and unfair methods of competition in commerce within the meaning of the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq.

Answers were filed by the petitioners, denying that they had ever maintained an unlawful combination to restrain competition; that their activities did not result from any combination or agreement; and that their activities were in the aid of, rather than the restraint of, competition. Extensive hearings were had before a trial examiner and the Commission made findings of fact and conclusions of law upon which its cease and desist order, here sought to be reviewed, was predicated.

While numerous contested issues are stated, the basic one is whether the findings of the Commission are substantially supported. If such be the case, there is the further issue as to the scope of the Commission's order.

In reality, the essential question for our determination is whether the members of the Institute acted in combination or by agreement for the purpose of fixing prices, or their activities contributed to such result, as found by the Commission. "Proof that a combination was formed for the purpose of fixing prices and that it caused them to be fixed or contributed to that result is proof of the completion of a price-fixing conspiracy under § 1 of the Act [15 U.S.C.A. § 1]." United States v. Socony-Vacuum Oil Co., Inc., et al., 310 U.S. 150, 224, 60 S.Ct. 811, 844, 84 L.Ed. 1129. In determining whether such finding is supported, it is not necessary, as argued, that there be direct proof of an agreement. Such agreement may be shown by circumstantial evidence, and the Commission, the same as any other fact finding body, is entitled to draw any reasonable inference from the circumstances of the situation. Much of petitioners' argument is devoted to an attempt to demonstrate

that their activities are lawful. That such may be the case when pursued without any agreement or combination may, for the purpose of the instant case, be conceded. Even so, however, it does not follow that they are lawful when practiced as a result of a combination or agreement.

The activities of the Institute and its members follow very closely those which we recently considered in United States Maltsters Ass'n et al. v. Federal Trade Commission, 152 F.2d 161. The legal questions presented in this case are identical with those we considered in the Maltsters case and the factual situation is quite similar. Here, as in that case, it is urged that the activities of the Institute and its members are lawful. In support of such contention, petitioners rely upon Maple Flooring Mfrs. Ass'n et al. v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093; Cement Mfrs. Protective Ass'n et al. v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L. Ed. 1104; and Sugar Institute, Inc., et al. v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859. Reliance was also placed upon these authorities in the Maltsters case, in which we discussed and distinguished them. What we there said is equally applicable in the instant case and need not be repeated.

The Commission found that "with the exception of short periods of time while adjustments in prices were being made, the prices charged by the respective respondent members (petitioners here), both f.o.b. and delivered, had been uniform and identical." Petitioners do not seriously challenge this finding. The record fully discloses that such was the situation for at least a period of more than four years immediately prior to the time of the commencement of the instant proceeding. To illustrate, a customer located in St. Paul could purchase cans at the same delivered price irrespective of whether the purchase was made from a member located in Chicago or St. Paul. Just how such an unnatural situation could be brought about by members of an industry without a plan or agreement is difficult, if not impossible, to visualize. The mere fact that the situation did exist in and of itself furnishes strong support that the Institute and its members were acting cooperatively and by agreement. It is contended, however, that the same delivered price, even though the result of a plan or agreement, did not affect price competition. In fact, it is argued

that an identical delivered price is in aid of price competition. Not being economists, we confess our inability to comprehend such an argument. True, the same delivered price might still leave room for competition, depending upon the circumstances of the case. This is so for the reason that there might be competitive factors other than price, such as quality and the appearance of the product. But insofar as price competition is concerned, we think that an agreement among manufacturers of a product to sell at the same delivered price would seriously interfere with, if not entirely destroy, competition in that respect.

No good purpose would be served in a detailed discussion of the various activities of the Institute and its members, relied upon by the Commission in support of its finding that they acted in concert and by agreement. A study of the record is convincing not only that the finding is substantially supported but that it would be difficult to reach any other conclusion. We shall, therefore, briefly refer to some of such activities, the most important of which is the so-called freight equalization plan. The Commission found that this plan was maintained for the purpose and with the result that "the delivered cost of their products was the same, regardless of from whom purchase was made or from which producing point the goods purchased were shipped," and further that the plan was not used by petitioners "on a competitive basis when reaching into a competitor's territory, since its use was solely to match competitor's prices," and that it "served only to maintain uniformity of delivered prices." Petitioners do not dispute but that this freight equalization system was used for the express purpose of effecting a uniform delivered price. In one of petitioners' briefs, it is stated: "As all cans are sold f.o.b. shipping point this equalization permits the manufacturers to submit their product to the prospective purchaser at a net delivery price unfettered by the distance between shipping (point) and that of the nearest competitor." This is merely another way of saying that by use of the freight equalization system all manufacturers are enabled to sell at the same delivered price.

It is argued, perhaps correctly, that such a freight system had long been employed by industry so that members thereof might deliver their product at the same

price. In fact, the Commission recognizes that this freight equalization plan was used by petitioners prior to the organization of the Institute. Such being the case, the fact still remains that it was employed by petitioners for the purpose of fixing the delivered price of their product and by such use price competition was eliminated or at any rate seriously impaired. On the face of the situation, it taxes our credulity to believe, as argued, that petitioners employed this system without any agreement or plan among themselves. Any doubt in this respect, however, is removed by reference to the minutes of the Institute and other evidence found in the record.

In connection with the freight equalization plan, petitioners employed what is referred to as the Climax freight rate book, which was utilized for the purpose of determining and quoting freight rates on an equalized basis. The minutes of the Institute disclose that such a service was discussed at meetings of the members, and its importance was recognized as a means of carrying out the equalization program. A large number of such freight rate books were procured by the Institute and distributed to its members. The use of these freight rate books standing alone may not mean much, if anything, but when used in the manner disclosed, it is a reasonable inference that they were part of the plan by which the desired result was to be obtained.

Another activity relied upon by the Commission which is not without weight is the so-called reporting system by which the activities of each of the members, including prices received from sales, is embodied in a daily report and sent to the Institute. The Commission found that such system was in order "to assure the maintenance of uniform prices," that it "was designed to and did permit" petitioner Hunter "to supervise the price activities" of manufacturing petitioners, that he "would from time to time, upon evidence or suspicion of variation in price as developed from various reports, call such deviation or possible deviation to the attention of the members as a whole, and from time to time requested said members to review their data to determine if the discrepancies were due to errors in compilation."

The record shows that this reporting system was adopted at Institute meetings following discussion by the members relative thereto. That is, the members agreed to make reports and, when called upon by the Commissioner, were required to submit evidence as to the correctness thereof. There is also testimony that this reporting system was for the purpose of enabling a member to determine whether or not his competitors were adhering to the price list. The brief of the Institute concedes that such reports "cannot be made to the Institute without a planned or agreed common course of action." It is insisted, however, that such course of action was not followed, pursuant to an agreement to fix and maintain prices. We think the record discloses to the contrary.

Another activity which indicates petitioners were acting in concert arises from the action of the Institute in establishing a classification of buyers, with a determined discount allowable to each class. Jobbers, for instance, were allowed a rate of discount different from consumers and retail establishments. This information concerning classification was included in the reports made to Hunter as commissioner of the Institute.

Much is said by petitioners concerning their claim that milk and ice cream cans are a standardized product. From this it is argued that uniformity of price was a natural rather than an artificial result. An argument of this kind has some merit as to certain products, such as sugar, salt, oil, etc., where the product from its nature is standard. We doubt, however, if there is any merit in the contention that a can is in such a category. We think it is true that they were standardized in the instant situation, but this was the result of the activities of the Institute and its members. In fact, there was a continuing effort and urging on their part that the cans be manufactured in uniform classifications. It may be, as argued, that much of this effort was to comply with various governmental regulations and for health purposes, but the fact still remains that it was easier to reach the goal of uniform prices on a standard product than on one which was not. The meticulous effort disclosed by the record by which petitioners standardized their products is also a strong circumstance in support of the Commission's finding that their activities were the result of an agreement.

It also is of importance to note that the minutes of the Institute meetings disclose that certain restrictions were placed on the sale of "seconds." The Commission

finds that this was done in order to prevent first quality cans being sold at an off price. The record discloses that commissioner Hunter on one occasion stated that the price differential on some sales of "seconds" was so small "as to suggest that 'firsts' were being sold as 'seconds'." Here again each member was required to report cans which were obsolete, as well as those which were sold as "firsts" and those sold as "seconds," together with the price received therefor. One of petitioners' officers testified that sales of "firsts" as "seconds" was a method of indirect price cutting.

We have merely touched upon some of the circumstances relied upon by the Commission in support of its finding that petitioners acted concertedly and by agreement. It is futile to contend that all of these activities could have been carried on so scrupulously and meticulously without an understanding or agreement. Any other conclusion would do violence to common sense and the realities of the situation.

It is contended that the present order of the Commission is inappropriate and invalid even though the findings of the Commission be accepted. It is argued, among other things, that the order prohibits lawful action, disassociated from a conspiracy to fix prices, that it is indefinite in its terms, and that it is susceptible of the construction that it prohibits independent action by the petitioners. We are convinced from a study of the order that there is little, if any, merit in the criticism made concerning it. The order provides that respondents (petitioners here) "do forthwith cease and desist from entering into, continuing, cooperating in, or carrying out any planned common course of action, mutual agreement, understanding, combination, or conspiracy between and among any two or more of said respondents or between any one or more of said respondents and others not parties hereto, to do or perform any of the following acts or practices." Then follow in eight paragraphs the activities enjoined. Summarized by paragraph, such activities are: (1) fixing or maintaining prices; (2) exchanging, distributing or relaying information as to current prices for the purpose of fixing or maintaining prices; (3) selling pursuant to a plan or system involving equalization of freight which results in a uniform delivered price; (4) using any freight rate reporting service as a factor in fixing prices; (5) formulating or using any price reporting plan for the purpose of depriving the public of the benefit of competition in price; (6) classifying purchasers for the purpose of maintaining uniform prices for various classifications; (7) (hereinafter discussed), and (8) employing the Institute or its commissioner, Hunter, as an instrument in the doing of the practices prohibited by the order.

■■ It will be noted that each of the prohibited acts is directed solely at price fixing in connection with an agreement or conspiracy. It is not a valid criticism to say that they are enjoined from the activities mentioned when used independently or even by an agreement unrelated to the price structure. The Commission in its brief concedes what we think is obvious: "It is wholly unnecessary that the order be amended so as to expressly reserve to petitioners their rights of independent action. They have those rights regardless of the order and those rights would not be changed or protected in the least by adding such a proviso. * * * The time when such questions should properly be determined is not in connection with the present consideration of the order but whenever the order is alleged to have been violated by a given set of facts. If those facts embody a condition of independent action it will be a perfect defense. The Commission knows as well as petitioners that no violation of the order in its present form can be established by any showing of independent action."

■ We are of the view, however, that one provision contained in paragraph (7) of the order should be eliminated. By it petitioners are enjoined from "formulating or putting into operation any other practice or plan which has the purpose or effect of fixing or maintaining prices for metal milk or ice-cream cans." The present plan has been tested and found unlawful and we see no reason why some other plan of which the Commission might complain should not be tested in the usual way rather than in a proceeding for violating the cease and desist order, as would be the case if this provision should remain in the order. In Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L. Ed. 518, the court eliminated from an injunction order a provision almost identi-

cal with the one under discussion. The court (196 U.S. at page 401, 25 S.Ct. at page 281) said:

"The general words of the injunction 'or by any other method or device * * *' should be stricken out. The defendants ought to be informed, as accurately as the case permits, what they are forbidden to do. Specific devices are mentioned in the bill, and they stand prohibited. The words quoted are a sweeping injunction to obey the law, and are open to the objection which we stated at the beginning, that it was our duty to avoid."

We think this reasoning is applicable to the provision in question and that it should be eliminated.

The petition to review and set aside the order to cease and desist is denied and the Commission's order, modified as suggested, is approved and enforcement allowed.