**TRIANGLE CONDUIT & CABLE CO., Inc., et al. v. FEDERAL TRADE COMMIS-SION.**

Nos. 8639, 8640, 8642, 8644, 8649.

Circuit Court of Appeals, Seventh Circuit.

May 12, 1948.

Rehearing Denied June 14, 1948.

Morton Peyser, of New York City, W. Denning Stewart, of Pittsburgh, Pa., Hoyt A. Moore, Albert R. Connelly and Earl J. O'Brien, all of New York City, Ferris E. Hurd, of Chicago, Ill., Thurlow M. Gordon, Robert M. Bozeman, Edward H. Green, and Roy L. Steinheimer, Jr., all of New York City, Rose, Eichenauer, Stewart & Rose, of Pittsburgh, Pa., and Cravath, Swaine & Moore, Cahill, Gordon, Zachry & Reindel, Sullivan & Cromwell, and Sullivan & Cromwell, all of New York City (Ray H. Luebbe and Neil C. Head, both of New York City, of counsel), for petitioner.

Walter B. Wooden, Everette MacIntyre, and W. T. Kelley, all of Washington, D. C., for respondent.

Before SPARKS, KERNER, and MINTON, Circuit Judges.

KERNER, Circuit Judge.

Petitioners, fourteen corporate manufacturers of rigid steel conduit, and five representatives of these corporations ask us to review and set aside a cease and desist order of the Federal Trade Commission, upon a complaint in two counts, charging that petitioners collectively have violated § 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45, which declares unlawful "unfair methods of competition in commerce." Each of the corporate petitioners except Spang Chalfant was a member of Rigid Steel Conduit Association. That association was a respondent in the proceedings before the Commissioner, but is not a petitioner here. Each of the five individual petitioners was not only an official of one of the corporate petitioners but also served in an official capacity in directing the affairs of Rigid Steel Conduit Association.

In substance the first count alleged the existence and continuance of a conspiracy for the purpose and with the effect of substantially restricting and suppressing actual and potential competition in the distribution and sale of rigid steel conduit in commerce, effectuated by the adoption and use of a basing point method of quoting prices for rigid steel conduit. The second count did not rest upon an agreement or combination. It charged that each corporate petitioner and others violated § 5 of the Federal Trade Commission Act "through their concurrent use of a formula method of making delivered price quotations with the knowledge that each did likewise, with the result that price competition between and among them was unreasonably restrained." It alleged that nearby customers were deprived of price advantages which they would have naturally enjoyed by reason of their proximity to points of production, and that such course of action created in said conduit sellers a monopolistic control over price in the sale and distribution of rigid steel conduit.

Petitioners answered the complaint. They denied any agreement or combination. After extensive hearings before a trial examiner, the Commission made its findings of fact and conclusions of law therefrom. It found the charges to be fully substantiated by the evidence.

Rigid steel conduit[1] is a steel pipe, used primarily in the roughing-in stage of building construction where electrical wiring is necessary in order to furnish a continuous channel or container for the wiring. It is made from standard steel pipe and is produced in two types differing only in the nature of the coating applied to it. It is a

---

[1] Hereinafter referred to as "conduit."

standard commodity. It was first manufactured in America in 1897, in or near Pittsburgh, Pennsylvania, and originally was sold at delivered prices. The reason why delivered prices were used lay in the relative importance of transportation charges in the sale of the product. Points of production include Cohoes, New York and various places in Pennsylvania, Illinois, Indiana, West Virginia and Ohio. Various means were used to facilitate the calculation of delivered prices, but Youngstown was the first manufacturer to prepare a freight rate bulletin specially applicable to conduit sales. Similar bulletins were prepared by other manufacturers and later such bulletins were procured by some manufacturers from a traffic expert.

In addition to freight rate bulletins, another aid in computing delivered prices was the use of delivery charge tables, which were designed to simplify the procedure of figuring the delivered prices, and each petitioner refrained from publishing price quotations f. o. b. point of production or shipment, but used the practice and method of quoting price sheets, which it termed "Price Cards," in which it designated base prices f. o. b. Pittsburgh, Pa. and f. o. b. Chicago, Ill. About 1912 one manufacturer began announcing quotations of prices, based on Pittsburgh as a basing point, through the use of price cards which listed "Pittsburgh Basing Discounts" under which the discount was decreased—and the net price thereby increased—in proportion to the freight rate from Pittsburgh to the point of delivery. The practice thus established was followed by other manufacturers then in existence, and since then, up to 1930, by other manufacturers as they have entered the conduit business.

In 1930, petitioner National Electric shifted from the list and discount form of delivered price quotation to a quotation which specified the net base prices, with freight to be added, and during the next year or so other manufacturers likewise changed to the quotation of net base prices plus freight. In 1924, conduit began to be sold at prices based on Gary, Indiana, as a basing point. During that year petitioner Youngstown began to manufacture conduit at Evanston, Illinois, and inaugurated the practice of quoting and selling conduit at delivered prices based on Evanston, as well as Pittsburgh, as a basing point, the base price at Evanston being $4 above the current published price at Pittsburgh. Clayton Mark, during the period (1924–1930), had quoted conduit prices upon a Chicago base. Since freight rates from Chicago and Evanston were the same, Evanston ceased to be a basing point shortly after 1934. Other manufacturers followed the practices inaugurated by Youngstown and Clayton Mark.

It also appears that instead of petitioner conduit sellers using an absolute Pittsburgh plus system for all designations in their price quotations, they collectively discussed and considered the matter of maintaining and utilizing Chicago as a basing point, with its differential over Pittsburgh, and that until 1930 they followed a method of calculating delivered price quotations which provided for discounting from the Pittsburgh or Chicago base price, depending upon which base price and accompanying discount produced the lower figure at the customer's destination, and that during 1930 representatives of petitioners at a meeting of the Rigid Steel Conduit section of the National Electrical Manufacturers Association determined upon a change from that method to the one they now use. Accordingly, at the time of the hearings each of the petitioner conduit sellers quoted delivered prices for conduit based on Chicago as well as on Pittsburgh as basing points and sold at that base price.

There was testimony that the system thus used was an effective means of matching bids and price quotations, and that the quotations made by each conduit seller, irrespective of whether it had a manufacturing plant located at or near Pittsburgh or Chicago, enabled them to match their price quotations. It also appears that at times it was difficult to exactly determine the railroad tariff rate and that mistakes by some conduit sellers in the selection of a particular tariff rate to be used in a particular instance were a fruitful source of differences in the delivered prices quoted, thereby preventing a matching of such

quotations. To prevent such errors, petitioners, acting through Rigid Steel Conduit Association, employed one Donley, who prepared a compilation of freight rate applicators containing the freight factor applicable from Pittsburgh to various destinations in the United States and, on a differential of $4 per ton above the Pittsburgh base price, the freight applicable from Chicago. These compilations became important adjuncts to petitioners' plans and methods in matching delivered price quotations. They were intended by petitioners to be used as their common price factors.

The findings upon which the order of the Commission is based are lengthy and of a comprehensive nature. In these findings the petitioners are identified by name in connection with the particular activities engaged in by them as part of their general plan of suppressing price competition through the combination charged. Essentially the findings are, that there was collective consideration of pricing policies on the part of representatives of petitioners in 1930 and collective considerations by such representatives of those matters through November, 1939; that by petitioners' adherence to their formula or system of pricing, their matching of bids under seal and the matching of their delivered price quotations was made effective, and a combination and conspiracy was maintained by petitioners to deprive purchasers of conduit of the benefits of competition in price, to maintain artificial and monopolistic methods and prices in the sale and distribution of conduit, to prepare and maintain common rate factors or freight adders used and useful in determining and establishing price quotations and prices for conduit, to classify customers of conduit and determine the treatment to be accorded them, to establish and maintain uniform discounts, terms and conditions of sale, to determine and control the use of warehouses in the distribution of conduit, to prepare, adopt, and use for the purpose of aiding in price maintenance and control, uniform contracts for distributors and for contractors buying for specific projects, and to enforce the terms of such contracts through investigations and reports thereon, to support and maintain their price structure through the conduct of investigations of sales and offers to sell, and the circulation of reports thereon; and that the acts and practices performed thereunder and in connection therewith, hindered, lessened and suppressed competition among sellers in the sale and distribution of conduit in interstate commerce.

These ultimate findings of fact are based upon subsidiary findings. It will not be necessary in this opinion to set forth these findings, as they appear in 38 Federal Trade Commission Decisions, 534–551. Upon these findings of fact the Commission concluded that these acts and practices constituted unfair methods of competition in commerce within the meaning of § 5 of the Act, and directed petitioners, other than General Electric Supply Corporation and Spang Chalfant, to cease and desist from entering into, continuing in, or carrying out any planned common course of action, understanding, agreement, combination, or conspiracy between any two or more of petitioners, or between any one or more of petitioners and others not parties hereto, to do or perform any of the things specifically set forth in the order. For the injunctive paragraphs covering the specific activities, see 38 F.T.C. Decisions, 593.

Petitioners assert that no finding was made as to when the conspiracy was instituted, how long it continued, and which respondents (petitioners) were members thereof. They insist that the Commission has failed to make a finding as to the conspiracy charged, together with findings which would disclose how and in what manner each of the petitioners became a member thereof.

In support of their contention, petitioners argue that the finding—

"Paragraph Nineteen: (a) Pursuant to Count I of the complaint herein the Commission concludes from the evidence of record and therefore finds that the capacity tendency and effect of the combination and conspiracy maintained by the respondents [petitioners] named therein in the manner aforesaid, and the acts and practices performed thereunder and in connection therewith * * * has been, and is, to hinder, lessen, restrain, and suppress

competition in the sale and distribution of conduit * * *," is wholly insufficient in law, because, so they say, the finding is only a description of the "capacity tendency, and effect" of the conspiracy.

In considering this contention, it is well to remember that findings are to be construed liberally in support of a judgment or order, Rank v. Kuhn, 236 Iowa 854, 20 N.W.2d 72. Whenever, from facts found, other facts may be inferred which will support the judgment, such inferences will be deemed to have been drawn, Clyde Equipment Co. v. Fiorito, 9 Cir., 16 F.2d 106, 107, and any words which fairly import a concerted action for a conniving together to restrain trade, are sufficient to charge conspiracy, American Tobacco Co. v. United States, 6 Cir., 147 F.2d 93, 117.

Pertinent and akin to the question we are now discussing are the words of Mr. Justice Douglas in his concurring opinion in the case of United States v. Line Material Company, 68 S.Ct. 550, 566, in which case, after stating that the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, outlaws price fixing combinations, he said: "Price fixing in any form is perhaps the most powerful of all inducements for abandonment of competition. * * * It is therefore one of the most effective devices to regiment whole industries and exact a monopoly price from the public. The benefits of competition disappear." And in the case of United States v. United States Gypsum Co., 68 S.Ct. 525, the court said that price fixing without authorizing statutes, is illegal, per se. See also Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502; Federal Trade Commission v. Pacific States Paper Trade Association, 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534; United States v. Trenton Potteries Co., 273 U.S. 392, 47 S. Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989. Any combination which tampers with price structures is engaged in an unlawful activity. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221, 60 S.Ct. 811, 84 L.Ed. 1129. And the existence of a plan or method which equalizes the delivered costs or prices of competitors having widely different freight costs to given destinations constitutes strong evidence in itself of an agreement to use such plan or system. Milk & Ice Cream Can Institute v. Federal Trade Commission, 7 Cir., 152 F.2d 478; Fort Howard Paper Co. v. Federal Trade Commission, 7 Cir., 156 F.2d 899. And price uniformity especially if accompanied by an artificial price level not related to the supply and demand of a given commodity may be evidence from which an agreement or understanding, or some concerted action of sellers operating to restrain commerce, may be inferred. Cement Manufacturers' Protective Association v. United States, 268 U.S. 588, 606, 45 S.Ct. 586, 69 L.Ed. 1104; Eugene Dietzgen Co. v. Federal Trade Commission, 7 Cir., 142 F.2d 321. The fixing of prices by one member of a group, pursuant to express delegation, acquiescence, or understanding, is just as illegal as the fixing of prices by direct, joint action. United States v. Masonite Corporation, 316 U.S. 265, 276, 62 S.Ct. 1070, 86 L.Ed. 1461. Moreover, the question we are now discussing was considered and decided in the Federal Trade Commission v. Cement Institute, 68 S.Ct. 793, 809. In disposing of the identical question, the court solved our problem. It said:

"It seems impossible to conceive that anyone reading these findings in their entirety could doubt that the Commission found that respondents, collectively maintained a multiple basing point delivered price system for the purpose of suppressing competition in cement sales. The findings are sufficient. The contention that they are not is without substance."

Petitioners also stress the point that the use of the basing point method of pricing does not have any adverse effect on competition and is not oppressive. They contend that in the event we should hold that the Commission made a finding that there was a price fixing conspiracy, such a finding is not supported by the evidence.

The argument is that there is no direct evidence of any conspiracy; that if the Commission made such a finding, it is based upon a series of inferences; and that the

180

general use of the basing point method of pricing and the uniformity of prices does not justify an inference of conspiracy. We think there was direct proof of the conspiracy, but whether there was or was not, in determining if such a finding is supported, it is not necessary that there be direct proof of an agreement. Such an agreement may be shown by circumstantial evidence. Milk & Ice Cream Can Institute v. Federal Trade Commission, supra, 152 F.2d at page 480.

▪ In this case there was evidence showing collective action to eliminate the Evanston basing point, and collective activities in promoting the general use of the formula presently to be noted. The record clearly establishes the fact that conduit manufacturers controlling 93% of the industry use a system under which they quote only delivered prices, which are determined in accordance with a formula consisting of a base price at Pittsburgh or Chicago plus rail freight, depending upon which basing point price controls at any particular destination or in any particular section of the United States; that as a result of using that formula the conduit producers were enabled to match their delivered price quotations, and purchasers everywhere were unable to find price advantages anywhere; and that purchasers at or near a place of production could not buy more cheaply from their nearby producer than from producers located at greater distances, and producers located at great distances from any given purchaser quoted as low a delivered price as that quoted by the nearest producer.

An example of an instance where petitioners have matched their bids appears where the Bureau of Supplies and Accounts, United States Navy Department requested bids under seal for the furnishing of one million feet of conduit for delivery at the Navy Yards in Philadelphia, Pennsylvania, Norfolk and Sewell's Point, Virginia. Seven of the petitioners submitted bids and matched their price quotations in terms of dollars per foot down to the fourth decimal point. Of course, there were other instances in the record showing identity of bids. Not only did petitioners match their bids when submitted under seal

to agencies of public bodies, but each, with the knowledge of the others, did likewise—used the formula for the purpose of presenting to prospective private purchasers conditions of matched price quotations.

In this state of the record it will be enough to say that Congress has left to the Commission the determination of the facts, Federal Trade Commission v. A. E. Staley Mfg. Co., 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338, and the weight to be attributed to the facts proved and the inferences to be drawn from them, Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 739, 65 S.Ct. 961, 89 L.Ed. 1320. See also United States Malsters Ass'n v. Federal Trade Commission, 7 Cir., 152 F.2d 161; Milk & Ice Cream Can Institute v. Federal Trade Commission, supra; Fort Howard Paper Co. v. Federal Trade Commission, supra; and Federal Trade Commission v. Cement Institute, supra. Our study of this record and of the applicable law has convinced us that the Commission was justified in drawing the inference that the petitioners acted in concert in a price-fixing conspiracy.

▪ We now turn to consider petitioners' contention that the individual use of the basing point method, with knowledge that other sellers use it, does not constitute an unfair method of competition. This contention embodies the theory of the second count of the complaint and of that part of the order to cease and desist that is directed against each of the corporate petitioners.

Briefly, the argument is that individual freight absorption is not illegal per se, and that the Commission's order is a denial of the right to meet competition. More specifically, petitioners say that conduit is a homogeneous product; that no buyer will pay more for the product of one seller than he will for that of another; that the buyer is not interested in the seller's cost of transportation or in any other factor of the seller's cost; that effective competition requires that traders have large freedom of action when conducting their own affairs; that in any particular market, the seller must adjust his own price to meet the mar-

ket price or retire from that market altogether; that it has always been the custom of merchants to send their goods to distant markets to be sold at the prices there prevailing; that there is no lessening of competition, or injury to competitors, when a seller absorbs freight traffic to meet lawful competition; and that it is for the court to decide as a matter of law what constitutes an unfair method of competition under § 5 of the Act. Federal Trade Commission v. Gratz, 253 U.S. 421, 40 S.Ct. 572, 64 L.Ed. 993.

On the other hand, the Commission contends that unfair methods of competition include not only methods that involve deception, bad faith, and fraud, but methods that involve oppression or such as are against public policy because of their dangerous tendency unduly to hinder competition or create monopoly.

As already noted, each conduit seller knows that each of the other sellers is using the basing point formula; each knows that by using it he will be able to quote identical delivered prices and thus present a condition of matched prices under which purchasers are isolated and deprived of choice among sellers so far as price advantage is concerned. Each seller must systematically increase or decrease his mill net price for customers at numerous destinations in order to match the delivered prices of his competitors. Each seller consciously intends not to attempt the exclusion of any competition from his natural freight advantage territory by reducing the price, and in effect invites the others to share the available business at matched prices in his natural market in return for a reciprocal invitation.

In this situation, and indeed all parties to these proceedings agree, the legal question presented is identical with the one the Supreme Court considered in the Federal Trade Commission v. Cement Institute case, supra. In that case, after stating that the Commission has jurisdiction to declare what conduct is an unfair method of competition, the court said: "* * * individual conduct, * * * which falls short of being a Sherman Act violation may as a matter of law constitute an 'unfair method of competition' prohibited by the Trade Commission Act. A major purpose of that Act * * * was to enable the Commission to restrain practices as 'unfair' which, although not yet having grown into Sherman Act dimensions would most likely do so if left unrestrained. The Commission and the courts were to determine what conduct, even though it might then be short of a Sherman Act violation, was an 'unfair method of competition.' This general language was deliberately left to the 'Commission and the courts' for definition because it was thought that 'There is no limit to human inventiveness in this field'; that consequently, a definition that fitted practices known to lead towards an unlawful restraint of trade today would not fit tomorrow's new inventions in the field; and that for Congress to try to keep its precise definitions abreast of this course of conduct would be an 'endless task.'"

In the light of that opinion, we cannot say that the Commission was wrong in concluding that the individual use of the basing point method as here used does constitute an unfair method of competition.

In their briefs and upon oral argument, petitioners have raised additional points. These, too, have been examined and considered by the Supreme Court in the Federal Trade Commission v. Cement Institute case, supra, and were found lacking in merit. Hence they need not be discussed by us.

The Commission's order is affirmed and an enforcement decree will be entered. It is so ordered.