### C–O–TWO FIRE EQUIPMENT CO. et al. v. UNITED STATES.

#### No. 12964.

United States Court of Appeals
Ninth Circuit.

May 29, 1952.

Rehearing Denied Aug. 11, 1952.

490

H. Bruce Baumeister, Hollywood, Cal., Francis R. Kirkham, William E. Mussman, Richard J. MacLaury, San Francisco, Cal. (Thorn Lord, Trenton, N. J., Pillsbury, Madison & Sutro, San Francisco, Cal., of counsel), for appellants.

William C. Dixon, Sp. Asst. to the Atty. Gen., James M. McGrath, Sp. Atty., Anti-Trust Division, Department of Justice, Walter S. Binns, U. S. Atty., Los Angeles, Cal., H. G. Morison, Asst. Atty. Gen., J. Roger Wollenberg, Sp. Asst. to the Atty. Gen., for appellee.

Before HEALY, BONE and POPE, Circuit Judges.

BONE, Circuit Judge.

On June 15, 1949, an indictment was returned against four corporations and three individuals charging them with a conspiracy in violation of Section 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U.S.C.A.

§ 1,[1] regarding the sale of portable carbon dioxide fire extinguishers in Southern California.

Three of the indicted corporate defendants—Walter Kidde & Company (hereafter called Kidde), American-La-France-Foamite Corporation (La-France), and General Pacific Corporation (Pacific)—and two individual defendants, entered nolo contendere pleas and were fined. Defendants-appellants C-O-Two Fire Equipment Co. (C-O-Two) and Maynard A. Laswell waived a jury, proceeded to trial, and on February 26, 1951 judgments of guilty were entered as to both. C-O-Two was fined $5,000.00 and Laswell was fined $1,000.00. Both appeal.

The indictment charged that from January, 1947 to June 15, 1949 the defendants in this action combined and conspired, in restraint of interstate trade and commerce, to fix, determine, establish and maintain non-competitive prices and terms and conditions relating to the sale of portable carbon dioxide fire extinguishers to ultimate purchasers in the Southern California area.

The combination and conspiracy (extending throughout the Southern California area) allegedly consisted of an agreement: (a) to fix and maintain prices to ultimate purchasers; (b) to fix and maintain terms and conditions of sale to ultimate purchasers; (c) to publish and distribute among dealers price lists showing uniform prices at which the corporate defendants sell to ultimate purchasers; (d) to require dealers to maintain and adhere to such prices and terms and conditions of sale; (e) not to sell or deliver fire extinguishers to dealers who did not maintain and adhere to such prices and terms and conditions of sale; (f) to quote and submit identical bids to governmental and public agencies, in accordance with such prices, and to require any dealer submitting competing prices to do likewise.

1. Section 1. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. * * * Every person who shall make any contract or engage in any combination or conspiracy declared * * * to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

The indictment further charged that for the purposes of effectuating the combination and conspiracy each of the corporate defendants by agreement and concert of action did the things they were alleged to have conspired to do, including, but not limited to the following acts: (a) the publishing periodically of lists showing prices and terms and conditions of sale to ultimate purchasers, which lists were identical with those published by the other defendants; (b) the instructing of its dealers to maintain and adhere to such lists; (c) the "policing" of its dealers to assure maintenance and adherence to such lists; (d) the submission of a bid to the County of Los Angeles for 104 fire extinguishers in strict conformance to such lists, and this bid was identical as to prices, terms, and conditions of sale with bids submitted by the other corporate defendants, and (e) the submission of a bid to the Department of Water & Power for the City of Los Angeles for 60 fire extinguishers in strict conformance to such lists, and this bid was identical as to prices, terms, and conditions of sale with bids submitted by the other corporate defendants.

All parties to this appeal agree that, substantially, none of the evidence produced at the trial was disputed. Most of the facts were either stipulated or admitted.

In accordance with the request of appellants, and pursuant to Rule 23(c) of the Rules of Criminal Procedure, 18 U.S.C.A. the District Court made findings of fact and conclusions of law. Inasmuch as appellants do not contest the competency of any of the evidence offered by appellee, but simply challenge the legal sufficiency of the evidence, we turn to a brief review of the findings. In so doing, it is well to bear in mind that it is not our function to adjudge the credibility of witnesses or weigh the evidence. In this case that duty rested upon the trial judge. Even though it might be said that this is a close case and from a consideration of all of the facts before him he might have reached a different conclusion, we are unable to conclude that his final determination is so far without support in credible and convincing evidence of guilt as to call for a reversal of his judgment.

The record reveals that there are five principal manufacturers of portable carbon dioxide fire extinguishers in the United States whose total sales constitute more than 90% of all such extinguishers sold in this country. They are the four corporate defendants below, and The General Detroit Corporation.[2] The factories of two corporate defendants, including appellant C-O-Two, are located in New Jersey, while that of a third is in New York, and the fourth corporate defendant manufactures in Los Angeles, California.

The evidence shows, and the trial court specifically found, that during the period from August, 1932 to about the year 1942, defendants Kidde, C-O-Two, and La-France were the only manufacturers of fire extinguishers in the United States. On August 24 and 25, 1932, Kidde entered into identical patent licensing agreements with La-France and C-O-Two, respectively, licensing the latter companies under certain patents relating to carbon dioxide fire extinguishers, including U. S. Patent No. 1760274. In or about March, 1940, Specialties Development Corporation, a wholly-owned subsidiary of Kidde, acquired all the rights of Kidde as licensor under these agreements, and the right to issue additional licenses under the patents. In December, 1944, Pacific (and its parent company, Detroit) accepted a license from Specialties under the same patents, including U. S. Patent No. 1760274. The licensing agreements terminated in the United States on or about May 27, 1947, that being the expiration date of U. S. Patent No. 1760274. The licensing agreements reserved to the licensor the right to require the licensees therein to sell, or otherwise dispose of, any fire extinguishing apparatus using any features covered by the licensed patents at

2. The General Detroit Corp. is not named in the indictment. Although it owns the controlling interest in the defendant Pacific, there is an intra-company territorial division under which Pacific handles all sales in the thirteen Western States, and the parent General Detroit sells in all other states in this country.

prices not less than or upon terms no different from those established by the licensor.

The record shows and the trial court found that from August 24, 1932 to May, 1947, (while the license agreements were in effect), and during the period from May, 1947 to the date of the return of this indictment, "the prices, terms, and conditions of sale, under which fire extinguishers manufactured by the defendants were sold to ultimate purchasers in the Southern California area, were *substantially identical* except for relatively short periods of time while price changes were being put into effect." (Emphasis supplied.) The corporate defendants, at various times, during the period covered by the indictment, published and distributed price lists among their respective dealers which contained the identical and agreed-upon prices at which the corporate defendants and their dealers would sell their extinguishers in the Southern California area.

Extinguishers were sold by the corporate defendants to dealers at their established discounts from the identical net, delivered consumer prices as established by the defendants in their respective price lists. The trial court further found that "substantially all * * * were sold by said dealers to the ultimate purchaser at the published net, delivered consumer prices of * * * defendants, upon the dealer's understanding that his particular supplier defendant *required* such fire extinguishers to be sold at such prices. The defendants * * * agreed *not to sell or deliver* * * * to dealers who failed to maintain and adhere to the prices, terms, and conditions of sale agreed upon and fixed by the defendants for the sale of fire extinguishers to ultimate purchasers in the Southern California area. The corporate defendants * * * *required* their dealers to maintain and adhere to the prices, terms, and conditions of sale agreed upon and fixed by the defendants * * *." (Emphasis supplied.)

In addition to sales to dealers, appellant C-O-Two, and the corporate defendants below, also sold substantial quantities of their extinguishers directly to ultimate purchasers in the Southern California area at identical prices. These prices were the published net, "delivered consumer" prices of each of the corporations named in the indictment. It is significant that the trial court also found that appellant C-O-Two had no cost records or other data indicating the manner or method of computing the sale price of the fire extinguishers manufactured and sold by it.

The findings further state that the corporate defendants, or their respective dealers, submitted identical price bids for fire extinguishers to the City of Los Angeles, Department of Water and Power, in or about May, 1948, and to the Purchasing Agent for the County of Los Angeles in or about August, 1948. In those two months, respectively, appellant C-O-Two caused its selling agent in the Los Angeles area to "police" two of its dealers who had submitted bids to the City of Los Angeles and to the County of Los Angeles on terms more advantageous to the City and County than those published in the price lists of C-O-Two. Such "policing" according to the Findings of Fact, was "for the purpose of compelling said dealers, under threat of refusal to furnish fire extinguishers, to withdraw their bids."

Appellants' principal contention would seem to be that the evidence does not prove beyond a reasonable doubt that they conspired to fix prices as charged in the indictment. Much is made of the dearth of direct evidence of conspiracy. It must be remembered, however, that "* * * in this modern era of increasing subtleties, it is rare indeed for a conspiracy to be proved by direct evidence." Milgram v. Loew's, Inc., 3 Cir., 192 F.2d 579, 583, certiorari denied 343 U.S. 929, 72 S.Ct. 762.

We examine then the circumstantial evidence which the trial court concluded pointed beyond a reasonable doubt to a conspiracy among defendant manufacturers to fix, determine, establish and maintain non-competitive prices and terms and conditions relating to sales of portable carbon dioxide fire extinguishers to ultimate consumers in the Southern California area. First, it is uncontroverted that appellant C-O-Two was a party to a licensing agreement, among the (then) only three manufacturers of portable carbon dioxide fire extinguishers in the

United States, which contained a minimum price maintenance provision. Now appellants strenuously argue that this provision was abrogated by mutual agreement in August, 1942. The record, however, does not reveal any price competition, as might be expected, in the industry after the alleged abrogation of the price maintenance provision. From such circumstances, the trier of the facts might properly have inferred, either that no such abrogation did in fact take place, or that it was done for appearances sake only and was not a thing of substance.

A stipulation inserted in the record indicates that appellant C-O-Two, and the other corporate defendants below, were members of the Fire Extinguishers Manufacturers Association, Inc., and that appellant Laswell represented C-O-Two on the Carbon Dioxide Committee of such association. It is uncontroverted that this committee held meetings at which Laswell, as well as representatives of the other defendant corporations, was present during the period covered by the indictment. That an opportunity was thus afforded to discuss and agree upon prices and pricing policies on an industry-wide basis, cannot be denied. Appellants seek to destroy any probative value from such a stipulation by pointing out that there is no direct evidence of what transpired at those meetings. But the trial court, sitting as the trier of the facts, regarded this evidence as being another one in a series of "plus factors" which, when standing alone and examined separately, could not be said to point directly to the conclusion that the charges of the indictment were true beyond a reasonable doubt, but which, when viewed as a whole, in their proper setting, spelled out that irresistible conclusion.

The standardization of product among the four defendant corporations named in the indictment is pointed to by appellee as another plus factor in the chain of circumstances that points to the conspiracy alleged. As stated by appellants' counsel in his opening statement, "These portable extinguishers are almost identical, and they use the same product, of course, carbon dioxide in them." In fact, appellants allege error in the trial court's refusal to admit proffered evidence in the form of the fire extinguishers themselves, for the purpose of showing that the product is identical throughout the United States. As stated by appellants' counsel, in making his offer of proof: "* * * we are selling a product that you can't identify except by—I couldn't at least, except by looking at the labels."

It is the contention of appellants that this standardization and substantial identity of product serves to explain the admitted price uniformity in the industry during the pertinent period. We think, however, that such standardization of a product that is not naturally standardized facilitates the maintenance of price uniformity. See Milk and Ice Cream Can Institute v. Federal Trade Commission, 7 Cir., 152 F.2d 478, 482. The appellants seek to rebut such conclusion and any inference of combined action that may arise therefrom with the testimony of their witness, Allen, that "we are required to meet standards set up by the Underwriters Laboratories in this respect, that we are required to put out certain sizes in order to obtain certain ratings * * *." This evidence may well explain the artificial standardization in regard to size. But we can well understand why the trial judge was unable to accept Mr. Allen's testimony as a satisfactory explanation for the similarity in color and other physical characteristics among the extinguishers manufactured by the different corporate defendants. Appellants make no effort to explain why these products, although manufactured by different companies, and formed of components manufactured by different companies, were indistinguishable save for their respective labels.

The stipulation entered into by the parties reveals that the corporate defendants, including appellant corporation, not only made sales to dealers, but also competed with those dealers by selling direct to the public on the retail level. Because of its importance, we here set out paragraph (5) of the First Supplemental Stipulation As To Facts, which consists of the agreed testimony of some sixteen dealers in the

products manufactured by defendant corporations:

"5. That if called upon to testify in the above captioned proceeding, each of the persons mentioned in Paragraph 3 hereof [sixteen dealers] would testify substantially as follows: That during said period purchases of portable carbon dioxide fire extinguishers were made either directly from one or more of the defendant corporations or through distributors of said corporations located in the State of California; that in reselling such fire extinguishers to consumers and users in the Southern California area, he or the corporation by which he was employed, as a matter of sales policy, generally adhered to the published consumer prices suggested by the defendant corporation whose product was being sold; that he knew that the consumer prices published by all of the defendants during the greater part of said period were *identical* with each other; that he understood that the defendant manufacturer whose product was being sold *required* that such product be sold at the consumer prices published by said defendant." (Emphasis supplied.)

It is the contention of appellee that in order to effectuate the so-called horizontal conspiracy, defendant corporations controlled the resale prices of the product. While it is apparent that there are several legitimate inferences that may be drawn from the stipulated testimony set forth above, it cannot be denied that one such inference is that which was drawn by the trier of facts below, and which appellee contends was a proper one. We agree.

■ We are not unmindful of the standard suggested in Pevely Dairy Co. v. United States, 8 Cir., 178 F.2d 363, 367, upon which appellants lay great stress, that: "In order to justify a jury in finding a verdict of guilty based entirely upon circumstantial evidence, the facts must not only be consistent with the guilt of the defendants, and each of the defendants, but they must be inconsistent with any other reasonable hypothesis that can be predicated upon the evidence." But that is not to say, as appellants would have us do, that such a rule must be separately applied to each link in the chain of circumstances and if one such unit does not fit the standard then the whole is likewise vulnerable. As said in United States v. Patten, 226 U.S. 525, 544, 33 S.Ct. 141, 145, 57 L.Ed. 333, " * * * the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." See also United States v. New York Great Atlantic and Pacific Tea Company, 7 Cir., 173 F.2d 79, 81.

■ A conviction resting solely upon circumstantial evidence is not an innovation. It is, we think, well established that the proof and evidence in an anti-trust conspiracy case is, in most cases, circumstantial. Proof of a formal agreement is unnecessary, and were the law otherwise such conspiracies would flourish; profit, rather than punishment, would be the reward. See American Tobacco Co. v. U. S., 6 Cir., 147 F.2d 93, affirmed 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575. As stated in Interstate Circuit, Inc., v. United States, 306 U.S. 208, 221, 59 S.Ct. 467, 472, 83 L.Ed. 610, "As is usual in cases of alleged unlawful agreements to restrain commerce, the government is without the aid of direct testimony that the distributors entered into any agreement with each other * * *. In order to establish agreement it is compelled to rely on the inferences drawn from the course of conduct of the alleged conspirators."

The record shows that on at least two occasions, defendant corporations, including appellant C-O-Two, submitted identical bids on fire extinguishers to the City and County of Los Angeles. Ross M. Bell, a dealer for appellant corporation, submitted a bid in May, 1948, in response to a request for same by the Department of Water and Power of the City of Los Angeles. The Bell bid provided a two per cent discount for payment within thirty days, in accordance with Bell's usual practice on public business.

"Q. Can you explain to the jury, or rather, can you explain to the Court

why in that particular case you gave a discount of two per cent? A. In that particular case it was definitely in error. It has always been the company's practice to give 2 per cent 30 days on City, County and State business. In this particular case, why, we were told definitely it should have gone in net 30 days, and that is the way we intended it to go in, but the stenographer,—it is just customary, as I say, for all the bids to go in 2 per cent 30 days, and I didn't catch it when the bids went in.

*    *    *    *    *    *

"A. If I understand your question right, you mean who told me to quote net 30 days?

"Q. Yes. A. I was told that—of course, it is right on their price sheet itself, net 30 days, and I was told it by Mr. Werk of the Pyrene Company, and also Mr. Reeves of the C-O-Two Company."

Mr. Bell then stated that after he received the contract on the basis of his bid, he received a phone call from Reeves (Rives) of the C-O-Two Company asking that he withdraw his bid and stating, in substance, that he would not be furnished the extinguishers.[3] The record shows that after being denied permission by the Department of Water and Power to withdraw his bid, Bell attempted to procure the extinguishers with which to fill the order direct from the C-O-Two factory in Newark, New Jersey. After a two week delay without acknowledgment, Bell received a wire from appellant C-O-Two that appellant Laswell would contact him regarding his order on the following day. Laswell, and a Mr. Keyes, also associated with C-O-Two, did call upon him, and although they finally agreed to deliver the order, they left no doubt in Bell's mind that the prices as designated by appellant C-O-Two should be maintained. Laswell's explanation, according to Bell's testimony, which the trial court

may well have accepted in preference to the testimony of Laswell himself, was that:

"* * * If one party would naturally cut prices that upsets the whole market which, you might say, would create price cutting and make it a bad item for all distributors to handle and it would be necessary more or less to police the thing to keep prices maintained so all distributors could have a fair margin of profit."

Testimony of similar import was given by Mr. Kurtzman of the F. S. & W. W. Hirsch Company, in reference to an August 1948 bid on fire extinguishers to the County of Los Angeles. That company submitted its bid at the published list price less a 1 per cent discount. Although this was the lowest bid submitted, Mr. Hirst, of the Hirsch Company, withdrew it prior to the award being made, after being phoned by a Mr. Werk.[4] Regarding that telephone call, William Hirst testified:

"A. Well, Mr. Werk told me, in substance, he said, 'Well, it looks like you got a bid or a contract, but,' he said, 'you are the only firm that stepped out of line.'

"The Court: What did you say to him?

"The Witness: Well, I asked him what did he mean by that? 'Well,' he said, 'every other bidder had the same identical price except you,' inasmuch as we allowed a one per cent discount."

Notwithstanding the items of evidence hereinbefore discussed, upon which the trial court based its conclusion that appellants C-O-Two and Laswell, together with the other defendants named in the indictment, violated Section 1 of the Sherman Act, appellants assert that the absence of direct evidence of a prearranged plan among the alleged conspirators is fatal to the prosecution. The significant case for the court to examine, according to appellants, is Pevely

3. Rives is a consignee warehouse representative of C–O–Two.

4. The Pyrene Company, by whom Mr. Werk was employed, owns 65% of the stock of appellant C–O–Two. C–O–Two and Pyrene enjoy a sales agreement whereby the former uses the salesmen of Pyrene in marketing C–O–Two products. Werk is a Pyrene representative in Los Angeles.

Dairy Company v. United States, 8 Cir., 1949, 178 F.2d 363, 371, certiorari denied 1950, 339 U.S. 942, 70 S.Ct. 794, 94 L.Ed. 1358.

In Pevely appellants were convicted of engaging in a conspiracy to fix wholesale and retail milk prices in the St. Louis area, in violation of Section 1 of the Sherman Act. The evidence introduced by the government was wholly circumstantial. The Court of Appeals for the Eighth Circuit reversed the trial court, and concluded that "The circumstances relied upon in the instant case can not reasonably be said to be inconsistent with the innocence of the appellants. * * *"

We are not persuaded that the logic of the Pevely case is controlling here. There the quality of the milk distributed was determined by ordinance of the City of St. Louis, and whatever artificial standardization of product took place was thereby explained. It is also a fact that milk, of Grade A quality, is a product which by nature approaches fungibility. All appellants, in Pevely, did business in the same area and all milk was received from the same source. Appellants introduced evidence showing that the price they paid for their product as delivered to them was fixed by government regulation. They showed that the cost of labor in processing the milk was substantially the same for each of them, it being determined by contracts with labor unions. Price changes were explained by detailed evidence of economic factors such as increases or decreases in the cost of processing and distributing. And a final distinguishing feature between the Pevely litigation and the instant case is found in the fact that all individual defendants, who were officers of appellant corporations in Pevely, were found not guilty by the jury. That this unusual situation influenced the appellate court's decision to reverse the conviction as to the corporate appellants is made clear by the following comment, 178 F.2d at pages 370, 371: "However, the verdict of not guilty as to the individual defendants in this case certainly stripped the verdict of guilty as to the corporation defendants of all semblance of logic or reason, and to

our minds weakened the presumption of correctness usually attributable to the verdict of a jury."

In the instant situation appellants have not come forward with any satisfactory explanation for the admitted price uniformity, nor was any evidence introduced to dissipate the inference of conspiracy arising from the history of licensing agreements with minimum price maintenance provisions, save for the bare statement that such provisions were abrogated. Appellants, in their brief, advise this court that "a great deal of evidence could have been offered below on costs, economics, and so forth." While that may well be true, it brings to mind the thought of Shakespeare that " * * * oftentimes excusing of a fault doth make the fault the worse by the excuse." At least it does not make appellants' position any better, since evidence which could have been offered, but was not, is as nothing.

Additional circumstantial evidence of the existence of a conspiracy as charged in the indictment is found in the fact that the corporate defendants charged identical consumer prices for their products regardless of where they may be sold in the United States. Under the pricing system used by defendants, a consumer in Los Angeles paid the same price for a fire extinguisher regardless of whether the purchase is made from a dealer or manufacturer located in New York, New Jersey, or Los Angeles, California. As was said in Milk and Ice Cream Can Institute v. Federal Trade Commission, supra, 152 F.2d at page 481:

"The Commission found that 'with the exception of short periods of time while adjustments in prices were being made, the prices charged by the respective respondent members (petitioners here), both f. o. b. and delivered, had been uniform and identical.' Petitioners do not seriously challenge this finding. The record fully discloses that such was the situation for at least a period of more than four years immediately prior to the time of the commencement of the instant proceeding. To illustrate, a customer located in St. Paul could purchase cans at the same deliv-

ered price irrespective of whether the purchase was made from a member located in Chicago or St. Paul. *Just how such an unnatural situation could be brought about by members of an industry without a plan or agreement is difficult, if not impossible, to visualize."* (Emphasis supplied.)

We hasten to agree with appellants' statement that uniformity of delivered price does not in and of itself create inference of collusion, where such uniformity has "simple and local explanations in the nature of the market, the product and the transportation costs." But appellants do not produce any such explanation here. Instead, a survey of market conditions in the fire extinguisher industry immediately after the last war indicates that although there was a substantial surplus of such extinguishers on the market (put there by the government), the defendant corporations increased their prices. Price increases which occur in times of surplus or when the natural expectation would be a general market decline, must be viewed with suspicion. Yet appellants offer no evidence to dispel doubts as to the legitimacy of their activities.

As to appellant Laswell, the trial court found that: "The defendant Maynard Laswell, as Vice President in Charge of Sales of defendant C-O-Two, during the period of the combination and conspiracy * * * instigated, determined, and supervised the prices and sales policies of defendant C-O-Two. He was a member of the Carbon Dioxide Committee of the Fire Extinguisher Manufacturers' Association, on which committee the other defendants were also represented. He policed and enforced the agreed-upon prices * * * on the dealers of defendant C-O-Two in the Southern California area during the period of the price fixing conspiracy."

We have examined the evidence introduced by the appellee regarding appellant Laswell, as well as the testimony of Laswell. Laswell, like appellant C-O-Two, denies the finding of "policing," but there is substantial evidence of such activity which the trial court could properly believe, and did believe. The position of Laswell is the same as that of the corporate appellant,

and is summarized by Mr. Lord, who represented appellants, as follows: "We have never denied any of the facts. * * * We simply say that the industry has used more or less identical prices to the consumer, and that is not in and of itself sufficient to establish a conspiracy."

Although Mr. Lord's statement may correctly state appellants' case, it does not properly set forth the precise question which we here decide. As before stated, that question is not whether identical prices throughout the industry *in and of itself* establishes a conspiracy. We would be deciding the unnecessary to answer that question. Here, however, we have in addition to price uniformity, the other so-called plus factors hereinbefore treated. They include a background of illegal licensing agreements containing minimum price maintenance provisions, an artificial standardization of product, a raising of prices at a time when a surplus existed in the industry, and a policing of dealers to effectuate the maintenance of minimum price provisions in accordance with price lists published and distributed by the corporate defendants, including appellant C-O-Two. Other factors which convinced the trial court, beyond a reasonable doubt, that the conspiracy did in fact exist, as charged, were the use of a delivered price system which resulted in price identity to the customer for the products sold, regardless of where they were manufactured, and the submitting of identical bids to public agencies. We think that the facts are not only consistent with the guilt of appellants, but also inconsistent with any other reasonable hypothesis.

Another specification of error alleged by appellants is that uniformity of price and size of extinguishers does not, *ipso facto,* prove beyond a reasonable doubt a conspiracy to fix prices. We have previously found this argument to be without merit, inasmuch as evidence of uniformity and size of product was *not* the only evidence in support of the allegations of the indictment.

[5] Appellants also contend that the trial court erred in describing the price

lists as containing "agreed-upon" prices and in stating in its Findings of Fact that the bids were "agreed-upon." While such terminology would seem to belong under Conclusions of Law, it does not appear to have prejudiced appellants in any way. The Findings of Fact and Conclusions of Law clearly disclose that the trial court held that the appellants were guilty beyond a reasonable doubt of the offense charged in the indictment. There is no prejudicial error.

We have examined other alleged errors specified by appellants and find them to be without merit. The judgment is, accordingly,

Affirmed.

### On Petition for Rehearing

HEALY and BONE, Circuit Judges.

The petition for rehearing is denied.

POPE, Circuit Judge (dissenting).

Upon consideration of the petition for a rehearing, and further consideration of the record, I am convinced that a rehearing should be granted. The evidence was equivocal, and the circumstances relied upon by the trial court in finding guilt, were, it now seems to me, equally consistent with innocence. I think, therefore, that there is grave question of the sufficiency of the evidence to prove guilt beyond a reasonable doubt.

It also seems to me that we did not pay sufficient attention to the evidence of substantial variation of prices during the period following the abrogation of the price-fixing provisions of the licenses and prior to the imposition of Government controls. I, for one, was too much impressed with the fact of identity of appearance of the products of the several manufacturers. As suggested in the petition for rehearing, no one has ever proposed that an inference of unlawful price-fixing arises from the identity of shovels, hoes, rakes or paint brushes. Because the opinion plows much new ground, I would invite a reargument.