**STATE OF MONTANA, Plaintiff,**

v.

**SUPERAMERICA, A DIVISION OF ASHLAND OIL, INC., et al., Defendants.**

**No. CV–79–30–M.**

United States District Court,
D. Montana,
Missoula Division.

Feb. 24, 1983.

Mike Greely, Atty. Gen., State of Mont., Jerome J. Cate, Asst. Atty. Gen., Chief, Antitrust Enforcement Bureau, Helena, Mont., for plaintiff.

Sherman V. Lohn, Garlington, Lohn & Robinson, Missoula, Mont., W. Donald Dresser, Howrey & Simon, Washington, D.C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

HATFIELD, District Judge.

This matter came on for trial before the court without a jury commencing on Wednesday, the 2nd day of June, 1982 through June 4, 1982 and continued on August 17 through August 19, 1982. The plaintiff State of Montana was represented by Jerome J. Cate, Special Assistant Attorney General, and by Sarah Power and Dorothy McCarter, Assistant Attorneys General, all of Helena, Montana. The defendant SuperAmerica, a division of Ashland Oil, Inc., was represented by Sherman V. Lohn, of the law firm of Garlington, Lohn and Robinson, Missoula, Montana, and by Ray S. Bolze, John C. Peirce and W. Donald Dresser of the law firm of Howrey and Simon, Washington, D.C. The parties proceeded to call their various witnesses and to present their evidence, and the court, having reviewed all the pleadings, briefs and documents on file herein, including each party's proposed findings of fact and conclusions of law, and having heard and seen the evidence presented, and being fully advised in the premises does hereby make the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. This action was commenced in the United States District Court for the District of Montana, Missoula Division, on March 29, 1979, by the State of Montana against SuperAmerica, a division of Ashland Oil, Inc., and various other gasoline retailers doing business in Missoula, Montana. All of the original named defendants, other than SuperAmerica, have reached settlements with the State, were dismissed pursuant to Rule 54(b), Federal Rules of Civil Procedure, and are no longer parties to this action.

2. The State's complaint in this lawsuit contained three counts. The first count alleged that SuperAmerica violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by engaging in a continuing combination and conspiracy in unreasonable restraint of interstate commerce, and by agreeing with its competitors to fix, maintain and stabilize the price of gasoline sold to natural persons residing in Missoula, Montana. The second count realleged the facts in count one and sought injunctive relief. The third count alleged that the actions of SuperAmerica

served to restrain trade in the State of Montana in violation of sections 30–14–103 and 30–14–205, Montana Code Annotated (1979).

3. The defendant, SuperAmerica, is an unincorporated division of Ashland Oil, Inc., which, during the period of time from October 1, 1976 to date, sold gasoline at retail to natural persons residing in and passing through the State of Montana at the SuperAmerica stations located at 111 Orange Street North and 1701 Brooks Street, Missoula, Montana.

4. The State alleges that it has standing to pursue its Sherman Act claim on behalf of the natural persons who purchased gasoline in Missoula pursuant to the *parens patriae* provisions of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, which added Sections 4C through 4H of the Clayton Act, 15 U.S.C. §§ 15c–15h. While SuperAmerica disputes the State's standing to pursue the Sherman Act claim in its capacity as *parens patriae,* because of the alleged lack of adequate notice to class members and other failures to comply with the *parens patriae* statute, that issue need not be addressed in view of the court's resolution of the merits.

5. There were at least sixty retail gasoline outlets in Missoula during the period from 1976 to 1979. Consequently, the retail gasoline business in Missoula was intensely competitive.

6. A large fraction of the population in Missoula buys gasoline at the lowest price available. There was evidence presented that a difference of just one cent between the prices offered at different retail outlets is sufficient to cause many Missoula residents to purchase gasoline from the lower priced outlet.

7. SuperAmerica's declared policy and general marketing approach during the period from October 1976 through March 1979 was to attempt to sell its gasoline at prices that were equal to or lower than the prices charged by all other retail outlets in Missoula.

8. Several of SuperAmerica's competitors in Missoula filed complaints with the State of Montana's Department of Business Regulation concerning SuperAmerica's low gasoline prices in Missoula. J. Gary Louquet, a competitor of SuperAmerica, wrote a letter to Senator Baucus complaining about SuperAmerica's low prices. Further, on occasion some of SuperAmerica's competitors attempted to complain directly to SuperAmerica regarding SuperAmerica's low prices. SuperAmerica did not respond to such complaints. SuperAmerica's employees were instructed by Ashland not to discuss gasoline prices with any competitor. There was no evidence of non-compliance with that instruction.

9. Evidence of complaints about SuperAmerica's prices by its competitors is inconsistent with the view that SuperAmerica colluded with those competitors in the price setting process.

10. Several retail gasoline dealers in Missoula, Montana, established an organization known as the Missoula Retail Gasoline Dealers Association ("MRGDA"). Cardinal Oil, the entity from which Ashland purchased the SuperAmerica stores in Missoula, was a member of the MRGDA for approximately one year, in 1967, after which it dropped out. The State alleges in its various memoranda that SuperAmerica was a member of the MRGDA. However, minutes of the MRGDA's meetings, produced at trial, make no mention of SuperAmerica, and provide no record of SuperAmerica's paying dues into the Association. An officer of the Association testified that SuperAmerica was not a member. A preponderance of the evidence does not support a finding that SuperAmerica, or any of its employees, was a member of, or otherwise participated in the activities or deliberations of, the MRGDA.

11. SuperAmerica did not engage in any of the so-called "cartel enforcement actions" generally attributed to members of the MRGDA, including billing back procedures, denial of credit, cutting of allocation and threats.

12.   The March 18, 1978, *Missoulian* article by Jonathan Krim regarding gasoline price-fixing in the Missoula area did not affect SuperAmerica's pricing behavior. The court finds that after the article appeared, SuperAmerica continued to adhere to its policy of pricing at or near the lowest price charged by its competitors.

13.   SuperAmerica independently determined what price to charge for gasoline that it sold in Missoula and how to run its business there.

14.   SuperAmerica often posted its retail gasoline prices on large signs so that those prices could be seen by customers from the street. Data submitted by the State's expert showed that while gasoline prices in the Missoula area tended to follow each other, they were not exactly identical, nor were the changes in price made in perfect unison. Therefore, the court finds that SuperAmerica's use of price signs was pro-competitive, offered useful price guidance to consumers and does not support an inference that the price signs were posted pursuant to any collusive agreement between SuperAmerica and its competitors.

15.   SuperAmerica periodically surveyed the prices that its competitors charged for gasoline. Those surveys were not taken pursuant to any agreement between SuperAmerica and its competitors, or for the purpose of enforcing any agreement. SuperAmerica was entitled to note what prices were being charged by its competitors. It was in SuperAmerica's economic interest to price its gasoline at or near the lowest price charged in Missoula, not only because this generated gasoline sales, but also because it tended to attract customers to SuperAmerica who ultimately purchased grocery items from inside the two SuperAmerica stores.

16.   Missoula gasoline retailers, including SuperAmerica, engaged in consciously parallel pricing practices, *i.e.*, they took into consideration the prices charged by their competitors, and usually set their own prices at or near those of their competitors.

17.   Given SuperAmerica's policy of attempting to match the lowest gasoline prices in the market area, it would be expected that SuperAmerica, in the exercise of independent business judgment, would decrease its prices in response to a price cut by a competitor. SuperAmerica's responsiveness to price changes by competitors was not inconsistent with the hypothesis that its prices were the result of unilateral pricing decisions.

18.   Identical, simultaneous price changes among competitors do not, in every situation, suggest collusive behavior. In the instant case, it was not economically irrational for SuperAmerica to engage in price following, and unilateral business judgment, rather than collusion, accounted for SuperAmerica's price following practices.

19.   Consciously parallel pricing behavior is equally indicative of competition and collusion. The record supports an inference that SuperAmerica's pricing behavior resulted from that entity's individual determination that its business interests would best be advanced by pricing its gasoline at or near the lowest price on the market.

20.   The existence of parallel pricing behavior does not support an inference of conspiracy in this case for several reasons, including the fact that (a) such pricing behavior was not inconsistent with SuperAmerica's business interests, (b) SuperAmerica had a declared policy of pricing at or near the lowest price on the market, and (c) SuperAmerica instructs its employees not to engage in price discussions with competitors.

The following conclusions of law, insofar as they may be considered findings of fact, are so found by the court to be true in all respects.

## CONCLUSIONS OF LAW

1.   This court has jurisdiction over the subject matter of the federal claims for relief, contained in Counts One and Two of the complaint, pursuant to sections 1 and 4 of the Sherman Act, 15 U.S.C. §§ 1 and 4, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, as amended. The

court's jurisdiction over the state claim for relief in Count Three is pendent to its jurisdiction over the federal claims for relief in Counts One and Two.

2. Venue in this action is properly in this judicial district pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c). The defendant maintains an office, transacts business, has an agent, and is found within the District of Montana. All claims alleged arose within the District of Montana.

3. Any agreement among competitors to raise, lower, stabilize or otherwise fix prices is an illegal conspiracy violative of section 1 of the Sherman Act. 15 U.S.C. § 1.

4. In order to establish that the defendant was involved in a conspiracy to raise, lower, stabilize or otherwise fix prices, the plaintiff must show that the defendant in some way came to an understanding with others to accomplish a common and unlawful purpose. In other words, the trier of fact must find that there existed "an element of agreement" between the defendant and its competitors, *Esco Corporation v. United States,* 340 F.2d 1000, 1007 (9th Cir.1965), though there is no requirement that a formal agreement be proven. *American Tobacco Company v. United States,* 328 U.S. 781, 809, 66 S.Ct. 1125, 1138–39, 90 L.Ed. 1575 (1945).

5. An agreement to unlawfully raise, lower, stabilize or otherwise fix prices may be inferred from various items of circumstantial evidence, including the defendant's business behavior. *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 540–541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1953).

6. In proper situations, consciously parallel pricing behavior may be used as circumstantial evidence from which an agreement can be inferred, for purpose of finding a combination or conspiracy in restraint of trade. *Id.* However, proof of parallel conduct, alone, is not sufficient to establish any type of collusive agreement. *Granddad Bread, Inc. v. Continental Baking Co.,* 612 F.2d 1105, 1112 (9th Cir.1979), *cert.*

*denied,* 449 U.S. 1076, 101 S.Ct. 854, 66 L.Ed.2d 798 (1981).

7. It is not unlawful for a business enterprise to take the prices charged by its competitors into account when setting its own prices, or to follow or copy the prices of a competitor, so long as the decision to do so is the result of unilateral business judgment and not the result of a collusive agreement. *United States v. International Harvester Co.,* 274 U.S. 693, 47 S.Ct. 748, 71 L.Ed. 1302 (1926).

8. To support an inference of agreement through conscious parallelism, the plaintiff must show that the defendants' business behavior was parallel, that the defendants were conscious of each other's conduct, and that their awareness was an element in their decisional process. *Schoenkopf v. Brown & Williamson Tobacco Corp.,* 637 F.2d 205, 208 (3rd Cir.1980).

9. Because consciously parallel pricing behavior does not, in itself, support a finding of unlawful collusion, *Granddad,* 612 F.2d 1105, 1112 (9th Cir.1979), *cert. denied,* 449 U.S. 1076, 101 S.Ct. 854, 66 L.Ed.2d 798 (1981), a plaintiff who alleges a conspiracy to fix prices in violation of the Sherman Act must present, along with evidence of the defendant's consciously parallel pricing behavior, evidence of something more, of so-called "plus factors". *See, Gainesville Utilities Dept. v. Florida Power and Light Co.,* 573 F.2d 292, 301 (5th Cir. 1978), *cert. denied* 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978).

10. "Plus factors" are independent items of evidence which, when coupled with evidence of conscious parallelism and a showing that the parallelism suggests collusion in that case, tend to support a finding of collusive agreement. *See, C–O–Two Fire Equipment Co. v. United States,* 197 F.2d 489 (9th Cir.1952), *cert. denied,* 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (1952).

11. Parallel pricing behavior is suggestive of collusion only where the parallel conduct was inconsistent with the defendant's individual self-interest and was

not a rational response to market conditions. *Weit v. Continental Illinois Bank & Trust Co.*, 641 F.2d 457, 462–465 (7th Cir. 1981), *cert. denied* 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982); *Venzie Corp. v. United States Mineral Products Co., Inc.*, 521 F.2d 1309, 1314 (3rd Cir.1975), citing Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv.L.Rev. 655, 681 (1962). Thus, while parallel pricing conduct may, in proper situations, give rise to an inference of agreement, such an inference is weakened or does not arise at all in cases where one would expect a business entity to alter its prices in response to a price change by a competitor. *Id.; and see, Proctor v. State Farm Mutual Automobile Insurance Co.*, 675 F.2d 308, 327 (D.C.Cir. 1982), cert. denied —— U.S. ——, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982).

12. Prices for standardized products such as gasoline tend to be similar because the market is competitive. *Independent Iron Works, Inc. v. United States Steel Corp.*, 322 F.2d 656, 665 (9th Cir.1963), *cert. denied* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963) (steel). Therefore, evidence of parallel pricing conduct is of a lesser probative significance where the product in question is standardized, such as in the retail gasoline business. *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir. 1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977).

13. Because the plaintiff has not established that SuperAmerica's parallel pricing behavior was inconsistent with its individual self-interest, *Weit,* 641 F.2d 457 (7th Cir.1981), and since the record evidence does not support the existence of the "plus factors" alleged by the plaintiff, including SuperAmerica's involvement with the MRGDA, its price communications with competitors, its involvement in the "cartel-enforcement actions", and the effect of the Krim article on SuperAmerica's prices, the court concludes that the plaintiff has not met its burden of establishing that Super-America participated in any agreement, contract, combination or conspiracy in violation of Section 1 of the Sherman Act, to raise, fix, maintain, control or stabilize the price of gasoline sold at retail in Missoula, Montana.

14. For the same reasons as cited above, the court concludes that the plaintiff has not met its burden of establishing that SuperAmerica has acted to restrain trade and commerce in the State of Montana in violation of Sections 30–14–103 and 30–14–205, Montana Code Annotated (1979).

15. SuperAmerica has prayed for an award of attorney's fees pursuant to Section 4C(d)(2) of the Clayton Act, 15 U.S.C. § 15c(d)(2). That section provides:

In any action under subsection (a), the court may, in its discretion, award a reasonable attorney's fee to a prevailing defendant upon a showing that the State attorney general has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.

The court concludes that the evidence does not support a finding that the plaintiff, in filing and prosecuting this action, has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. Consequently, SuperAmerica's request for an award of attorney's fees must be, and the same hereby is, DENIED.

NOW, THEREFORE, IT IS HEREBY ORDERED that judgment be entered in accordance with these findings of fact and conclusions of law.

Counsel for all parties are requested to advise the court whether any issues remain to be litigated and determined.