WILCOX DEVELOPMENT COMPANY; Mid-Willamette Village Ore., Ltd.; Glenn L. Wilcox and Lorraine Wilcox, individually, and on behalf of all others similarly situated, Plaintiffs,

v.

FIRST INTERSTATE BANK OF OREGON, N.A.; and First Interstate Bancorp, Defendants.

James K. KUNKLE, an individual residing in the State of Nevada, Plaintiff,

v.

FIRST INTERSTATE BANK OF OREGON, N.A., a national banking association, Defendant.

KUNKLE & STONE, INC., Plaintiffs,

v.

FIRST INTERSTATE BANK OF OREGON, N.A.; a national banking association, and First Interstate Bancorp, a Delaware corporation, with its principal place of business in California, Defendants.

Michael F. MONTGOMERY and Rosemary Montgomery, Plaintiffs,

v.

FIRST INTERSTATE BANK OF OREGON, N.A., a national banking association, and First Interstate Bancorp, a Delaware corporation, with its principal place of business in California, Defendants.

Civ. Nos. 81–1127–RE, 82–754–RE, 83–1766–RE and 83–1909–RE.

United States District Court, D. Oregon.

Jan. 7, 1985.

See also 590 F.Supp. 445.

Henry A. Carey, Henry A. Carey, P.C., John D. Ryan, John D. Ryan, P.C., Leslie M. Roberts, Kell, Alterman & Runstein, Portland, Or., for plaintiffs.

Wayne Hilliard, Spears, Lubersky, Campbell & Bledsoe, Portland, Or., for defendants.

## OPINION

REDDEN, Judge:

These four cases were consolidated for trial on plaintiffs' allegations of defendants' violation of 15 U.S.C. § 1, the Sherman Antitrust Act. Plaintiffs asserted some twenty other claims in these four cases, all of which were decided in favor of defendants in subsequent trials, or upon summary judgment.

In the antitrust claim, plaintiffs alleged that defendants had agreed with other banks to raise, fix and maintain the "prime" interest rate at an artificial and anticompetitive level. Plaintiffs stated that defendants had told them that they were receiving the minimum lending rate available to the most credit worthy customer, when in fact defendants were charging some customers a lower lending rate. Plaintiffs further asserted that had they known that a more favorable rate was available, they would have insisted upon being charged that rate.

The cases were tried to a jury in April and May and resulted in a verdict for plaintiffs. Defendants now move the court for an order granting them a judgment notwithstanding the verdict, or in the alterna-

tive, for a new trial. For the reasons set forth below, I grant defendants' motion for judgment notwithstanding the verdict.

## DISCUSSION

I. *Standard for Judgment Notwithstanding the Verdict*

In considering a motion for judgment notwithstanding the verdict, the court must give appropriate deference to the jury's verdict. Such a motion should only be granted if, without accounting for the credibility of the witnesses, the evidence and all its inferences, considered in the light most favorable to the non-moving party, can support only one conclusion: that the moving party is entitled to judgment. *William Inglis and Sons v. ITT Continental Baking Co.*, 668 F.2d 1014, 1026 (9th Cir.1981). The verdict of the jury must stand if it is supported by substantial evidence. *Marquis v. Chrysler Corp.*, 577 F.2d 624, 631 (9th Cir.1978). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 853 n. 2 (9th Cir.1977).

II. *What Constitutes a Violation of 15 U.S.C. § 1*

■ To be successful in a cause of action alleging a violation of 15 U.S.C. § 1, plaintiffs must establish: 1) an agreement among two or more persons or distinct business entities, which is 2) intended to harm or unreasonably restrain competition, and 3) which actually causes harm to competition. *Rosebrough Monument Co. v. Memorial Park Cemetary*, 666 F.2d 1130, 1138 (8th Cir.), *cert. denied*, 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1981).

■ Plaintiffs need not prove that the parties entered into an express agreement. Rather, one may be implied from the "course of dealings or other circumstances as well as the exchange of words." *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Where the circumstances are such to warrant a finding that the parties had a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement, then the conclusion that a conspiracy is established is justified. *Id.* at 810, 66 S.Ct. at 1139.

■ In the absence of an express agreement, courts often consider the existence of parallel business behavior when inferring an agreement. However, parallel action alone will never be enough to establish an agreement for purposes of showing a conspiracy in violation of 15 U.S.C. § 1. *Granddad Bread, Inc. v. Continental Baking Co.*, 612 F.2d 1105 (9th Cir.), *cert. denied*, 449 U.S. 1076, 101 S.Ct. 854, 66 L.Ed.2d 798 (1979). Conscious parallel conduct will be regarded as evidence of an agreement only in those situations in which the similarity of behavior can only be attributed to a tacit agreement, and the parties are acting in a manner against their own individual business interest, or there is motivation to enter into an agreement requiring parallel behavior. *Zoslaw v. M.C.A. Distributing Corp.*, 693 F.2d 870 (9th Cir.1982), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). Additionally, evidence of lawful business reasons for parallel conduct will dispel any inference of a conspiracy. *Independent Iron Works, Inc. v. United States Steel Corp.*, 322 F.2d 656 (9th Cir.), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963).

There are a series of "plus factors" to be considered by the court when inferring an agreement for purposes of 15 U.S.C. § 1. *C–O Two Fire Equipment Co. v. United States*, 197 F.2d 489 (9th Cir.1952). In addition to parallel conduct (expressed as price and product uniformity), the court should look for exchanges of price information among alleged conspirators, and meetings affording them an opportunity to form industry-wide policies. *Id.* at 493, 497.

III. *Evidence Presented at Trial*

Plaintiffs argue that the virtual identity of prime rates among defendants and seven other major west coast banks, in and of

itself, establishes the conscious parallel conduct needed to infer an agreement. In support of this contention plaintiffs point to defendant First Interstate Bank's (FIOR's) "count to four" method of setting its prime rate. Plaintiffs argue that this method was not a result of FIOR's good faith business judgment because this rate was not tied to its costs of funds.

There was ample testimony from all expert witnesses at trial that defendants "prime rate" is a national prime rate imposed by national economic conditions. The testimony of the experts clearly established that the prime rates used by banks are set to reflect market demands and individual self interest in attracting new and retaining old customers.

Dr. Horvitz, plaintiffs' principal expert witness, testified that although there are noncompetitive factors which influence an individual bank's prime rate, all banks will use essentially the same rate, even without any agreement or collusion among the banks. Dr. Fischer testified that any divergence from the national prime rate by a bank would be "foolishness." Dr. Eisenbeis stated that all banks use substantially the same rate because the market so demands, and that in order for a bank to be competitive in the market, it must adhere to the uniform prime rate.

There was also extensive testimony to the effect that defendants could not maintain their prime rate at a level different from other large commercial banks. If defendants maintained their rates higher than that of other banks, their customers would take their business elsewhere. Likewise, if defendants were to set their prime rate lower than other banks, they would lose revenues on existing prime-based loans and dangerously reduce their profit margin. Moreover, the testimony established that if defendants were to reduce their prime rate below that of other banks, customers with outstanding commitments might take advantage of the lower rate loans from defendants to pay off their higher rate loans at other banks. This would not only create liquidity problems for defendants, but it would ultimately result in an increase in the cost of funds to all banks.

In setting its prime rate FIOR uses what it calls a "count to four" method. FIOR will change its prime rate when four of seven specific major west coast banks change theirs. These banks adjust their prime rate to reflect the rates set by the nation's largest banks. Plaintiffs contend that this practice infers an agreement because the changes are not tied to FIOR's cost of funds. Thus, plaintiffs argue, no good faith business judgment sparks FIOR's decision to change its prime rate. This argument fails because it was established that changes in the national prime rate reflect changes in the cost of money. It was also established that FIOR's "count to four" method was instituted unilaterally, and that none of the other banks used this method in adjusting their prime rates.

It is not unlawful for a business enterprise to take the prices charged by its competitors into account when setting its own prices, or to follow or copy the prices of a competitor, if the decision to do so is the result of unilateral business judgment, and not the result of a collusive agreement. *United States v. International Harvester Co.*, 274 U.S. 693, 47 S.Ct. 748, 71 L.Ed. 1302 (1927). While parallel pricing conduct may, in proper situations, give rise to an inference of an agreement, such an inference does not arise in cases where one would expect a business entity to alter its prices in response to a price change by a competitor. *Proctor v. State Farm Mutual Automobile Insurance Co.*, 675 F.2d 308, 327 (D.C.Cir.1982); *State of Montana v. Superamerica*, 559 F.Supp. 298, 303 (D.Mont.1983).

I find the existence of a near universal prime rate does not support an inference of an agreement among defendants and other banks to "fix the prime rate." FIOR adjusts its prime rate, up or down, in response to changes by four named west coast banks. Those banks, in turn, respond to eastern pacesetters. Invariably the rate adjustments start with the larger east coast banks early in the banking day. The

adjustments roll across the country as does the sun, and virtually every bank in the nation responds. This does not prove an illegal conspiracy between defendant FIOR and the specified west coast banks. The evidence supports the conclusion that FIOR exercises its independent business judgment in order to maintain its ability to compete. This response to competition is not illegal.

Plaintiffs note that it is a common practice of businesses and financial institutions to subscribe to wire services that quickly transmit changes in the prime rates across the country. This practice, plaintiffs argue, constitutes an "exchange of prices" among the banks. Plaintiffs further state that this "plus factor," coupled with the uniform prime rate charged by banks, creates the necessary inference of an agreement. In support of the argument plaintiffs cite *United States v. Container Corporation of America,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969). Plaintiffs' reliance on this case is misplaced.

In *Container Corp.* the Court held that an exchange of information concerning specific sales to identified customers, rather than a mere exchange of easily obtainable statistical data, resulted in a violation of § 1 of the Sherman Antitrust Act. However, the Court also noted that "[t]he case as proved is unlike any other price decision we have rendered." *Id.* at 334, 89 S.Ct. at 511. The holding of the case turned on the specificity of the information exchanged and the fact that absent the exchange the information was not otherwise available to the individual defendants.

Here, plaintiffs contend that public information which is regularly disseminated to all types of businesses including financial institutions and the media should be considered in the same light as the private and specific price information in *Container.* I do not agree. I do not find that the use of the wire services to inform the public of the changes in the prime rate violates § 1 of the Sherman Antitrust Act, even when coupled with a nearly uniform national prime rate.

Plaintiffs also contend that regular meetings between Bancorp and the Chief Executive Officers (CEOs) of five subsidiaries provided an opportunity for these banks to enter into agreements to fix the prime rate. Plaintiffs also point to various industry-wide conventions which provided other banks with an opportunity to conspire with Bancorp and its subsidiaries to fix the prime rate. These facts, plaintiffs argue, supply yet another "plus factor" and substantiate their claims of a violation of § 1 of the Sherman Antitrust Act.

This argument must also fail. There was ample testimony at trial that while the CEOs of the five Interstate Banks did meet regularly with the Chairman of the Board of Bancorp, they did not agree at any time to fix the prime rate. Mr. Pinnola of Bancorp expressly stated that although there was one discussion of a system wide uniform prime rate, the idea was rejected. He stated that after discussing the matter, it was agreed that the diversity of the clientel of individual banks rendered a uniform prime rate impossible to administer.

■ As for plaintiffs' notation regarding the conventions, there was no direct evidence of collusion, or even a discussion among the bankers at conventions to fix the level of the prime rate. Absent any evidence, I decline to infer the existence of any such agreement on the basis of the fact that bankers were gathered together in one central location at a given point in time. One wonders why a discussion, agreement or conspiracy would be necessary. Banks have been following eastern pacesetters for years regularly and openly. Given the competitive realities which apply, it would be of no real point to agree to that which they had been doing and felt compelled to continue to do.

■ Plaintiffs also point to the fact that, from time to time, some customers obtained loans at an interest rate below that of the advertised "prime rate." This practice, plaintiffs argue, created a two tier credit pricing system which operated to restrict competition in interest rates available to the second tier borrower, or the

"middle market." Plaintiffs also state that the interest charged on these loans was not uniform from bank to bank and that the rate charged was based directly on the cost of money to the bank. Plaintiffs argue that these facts infer an unlawful agreement to fix the prime rate because they negate defendants' contention that the interest rates on short term credit are necessarily uniform because they are controlled by outside market forces. Each of these arguments fails.

It is undisputed that alternate rate loans were made available to some bank customers, and that the interest charged on those loans was less than the prime rate charged on loans to the "middle market." This, however, does not support an inference of an agreement to fix the prime rate.

The alternate rate loans were made to a relatively few low risk borrowers in extremely large amounts, at a fixed rate of interest, for a fixed period of time, without a right of prepayment and for a relatively short period. All witnesses agreed, including plaintiffs', that alternate rate based loans were made to customers in a completely separate market from prime based loans, and thus, the factors influencing the interest rate were different than the factors influencing the interest rate charge on prime based loans.

Plaintiffs' suggestion that the narrow profit margin involved in providing alternate rate based loans gave defendants the motivation to fix a higher prime rate in order to maximize their profits was not supported by the evidence. The testimony at trial established that defendants could offer certain customers a lower rate on specific kinds of loans due to the low risk nature of those loans. The testimony further established that the "middle market" borrower generally was not a low risk, secure borrower. The testimony made it clear that the plaintiffs did not qualify for alternate rate loans which were designed for and available to low risk borrowers who qualified for very large loans at fixed rates for a fixed short period and without the right of prepayment. This type of loan was not suitable for the type of borrowers here involved.

Both plaintiffs and defendants have exhaustively argued the applicability of the recent Supreme Court case of *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). In that case the Court held that a parent and its wholly owned subsidiary were incapable of conspiring in violation of § 1 of the Sherman Antitrust Act. I conclude that this case does not apply to the present litigation. The Supreme Court expressly noted, "[w]e limit our inquiry to the narrow issue squarely presented: whether a parent and its wholly owned subsidiary are capable of conspiring in violation of § 1 of the Sherman Act." 104 S.Ct. at 2740. The present case involves questions of whether sister corporations and other non-affiliated organizations conspired in violation of the Sherman Antitrust Act, and hence *Copperweld* is inapplicable.

### CONCLUSION

After a review of the evidence presented at trial, and all reasonable inferences drawn therefrom and considered in the light most favorable to plaintiffs, I find only one conclusion can be supported; that FIOR is entitled to judgment notwithstanding the verdict. I also find that the verdict of the jury was not supported by substantial evidence.