### In re Carlos Arciga CACHU and Silvia G. Cachu, Debtors.

### No. 04–16722–B–13.

United States Bankruptcy Court, E.D. California, Fresno Division.

Feb. 15, 2005.

---

3. Like any order allowing a claim, this determination may be reconsidered for cause pursuant to § 502(j) of the Code.

David J. Fillerup, Bakersfield, CA, for Debtors.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW RE OBJECTION TO CONFIRMATION OF CHAPTER 13 PLAN**

W. RICHARD LEE, Bankruptcy Judge.

In this chapter 13 contested matter, the court is called to fix the "cramdown" interest rate applicable to the County of Kern's claim for real property taxes in light of the U.S. Supreme Court's ruling in *Till v. SCS Credit Corporation*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004). An objection to confirmation of the Debtors' chapter 13 plan was filed by Phil Franey, Treasurer/Tax Collector for Kern County (the "County"). Jerri S. Bradley, Esq., appeared on behalf of the County. David J. Fillerup, Esq., appeared on behalf of Carlos and Silvia Cachu (the "Debtors"). M. Nelson Enmark, Esq. appeared in his capacity as the chapter 13 trustee (the "Trustee"). The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 1325. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (L), & (O). For the reasons set forth below, the Debtors' chapter 13 plan (the "Plan") will be confirmed with interest payable on the County's property tax claim at 4.75% per annum.

### Findings of Fact

This bankruptcy commenced on August 4, 2004. The Debtors have not filed any other bankruptcy petition within the last six years. The Debtors' schedules list secured debts in the amount of $64,366, no priority debts, and unsecured debts in the amount of $45,435. The Debtors own their home valued at $65,000 (the "Home"). The liens against the Home, exclusive of an avoidable judgment lien and the property taxes, total $23,877, leaving an equity of approximately $41,123, which the Debtors have claimed as exempt.[1] The balance due on the first priority mortgage was only $1,500, the mortgage was current at commencement of the case, the Debtors continued to make those payments outside of the chapter 13 plan and the last payment was due in January 2005. The County filed a proof of claim for prepetition property taxes, penalties, and interest assessed against the Home for the 2001 through 2004 tax years, in the amount $3,599.13 (the "Tax Claim").

Carlos Cachu is employed in the retail industry. At commencement of the case, Silvia Cachu received unemployment income in the amount of $668 per month and the Debtors' combined monthly income was $2,528. However, Mr. Cachu filed a declaration in support of confirmation which states that his job responsibilities have changed and that his income has increased by approximately $600 per month. The Plan commits the Debtors to make payments to the Trustee totaling $77,560, which includes the postpetition mortgage payments, over a period of 60 months ($992 for the first five months and $1,320 for the remaining 55 months). The Plan proposes to pay 0% to the unsecured creditors. It also provides for payment of the Tax Claim in full with interest at the annual rate of 2.5%.

### The Issue

The County objected to confirmation of the Plan on the grounds that the proposed treatment of its Tax Claim, specifically the 2.5% interest rate, does not comply with the chapter 13 cramdown clause of the Bankruptcy Code, 11 U.S.C. § 1325(a)(5)(B)(ii).[2] Under *Till*, the cramdown interest rate should be determined after an evidentiary hearing. 124 S.Ct. at 1961. At oral argument, both parties waived the right to an evidentiary hearing and submitted the matter for a decision based on the record. The Trustee did not object to confirmation of the Plan.

### Analysis and Conclusions of Law

#### The Prime–Plus Interest Rate

Prior to the Supreme Court's ruling in *Till*, bankruptcy courts disagreed philosophically over the methods and objectives

1. The schedules list a judicial lien against the Home in the amount of $7,188, which the Debtors have moved to avoid pursuant to 11 U.S.C. § 522(f)(1)(A). That motion, which was embedded with the Plan, was properly served on the judgment creditor and was unopposed. Accordingly, the judgment lien will be avoided as part of the confirmation order.

2. 11 U.S.C. § 1325(a)(5) prescribes the treatment of a secured claim in chapter 13. It sets forth two elements for "cramdown" of a chapter 13 plan if the secured creditor does not consent to the plan and the debtor does not surrender the collateral. Subsection 1325(a)(5)(B) provides:

   [T]he court shall confirm a plan if—
   . . .
   (5) with respect to each allowed secured claim provided for by the plan—
   . . .
   (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
   (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim.

for fixing the discount rate (interest rate) which must be paid to a secured creditor to satisfy the "value as of the effective date of the plan" language found in the numerous cramdown provisions of the Bankruptcy Code, including 11 U.S.C. §§ 1129(b)(2)(A)(i)(ii) (chapter 11), 1225(a)(5)(B)(ii) (chapter 12) and 1325(a)(5)(B)(ii) (chapter 13).[3] From this debate evolved essentially four different interest rates described in *Till* as the formula rate, the coerced loan rate, the presumptive contract rate, and the cost of funds rate. 124 S.Ct. at 1960–61. Even before *Till*, the Ninth Circuit had settled on the formula method. (*See In re Fowler*, 903 F.2d 694, 697 (9th Cir.1990)) (calculating the "market rate" by starting with a base rate and then adding a factor based on the risk of default and the nature of the security). The Supreme Court resolved this conflict, at least for chapter 13 cases; it also adopted a formula method for calculating what it described as the "prime-plus" interest rate.

The *Till* Court began its analysis by recognizing that deferred payments through a chapter 13 plan do not offer the same "value" for cramdown purposes as a lump sum payment. It summarized the distinction, and the associated risk of deferred payment as follows:

> A debtor's promise of future payments is worth less than an immediate payment of the same total amount because the creditor cannot use the money right away, inflation may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment. The challenge for bankruptcy courts reviewing such repayment schemes, therefore, is to choose an inter-

est rate sufficient to compensate the creditor for these concerns.

124 S.Ct. at 1958.

The Court concluded that a proper analysis of the cramdown interest rate requires an objective, rather than a subjective inquiry; *i.e.*, the rate is not a function of the individual creditor's particular circumstances. The Court defined the parameters and objectives for setting a cramdown rate as follows:

> [I]t does not require that the terms of the cram down loan match he terms to which the debtor and creditor agreed prebankruptcy, nor does it require that the cram down terms make the creditor subjectively indifferent between present foreclosure and future payment. Indeed, the very idea of a "cram down" loan *precludes* the latter result: … Thus, a court choosing a cram down interest rate need not consider the creditor's individual circumstances, such as its prebankruptcy dealings with the debtor or the alternative loans it could make if permitted to foreclose. (footnote omitted) Rather, the court should aim to treat similarly situated creditors similarly, (footnote omitted) and to ensure that an objective economic analysis would suggest the debtor's interest payments will adequately compensate all such creditors for the time value of their money and the risk of default.

*Id.* at 1959–60

After consideration of all four approaches to cramdown treatment, the *Till* Court adopted a two-part "prime-plus" formula for purposes of compliance with § 1325(a)(5)(B)(ii). The components of the prime-plus formula were explained as follows:

**3.** Unless stated otherwise, all references to "section," "subsection," or "Code" refer to the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

[T]he approach begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default. (footnote omitted) Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan.

*Id.* at 1961.

■ The debtor has the burden of proof as to the first element of the prime-plus formula, the prime rate. The second element, the risk adjustment, must be proved by the secured creditor and may require an evidentiary hearing. *Id.*

### The Prime Rate

■ The treatment of a secured claim for cramdown purposes must be fixed "as of the effective date of the plan." § 1325(a)(5)(B)(ii). The form chapter 13 plan used in this District makes the plan "effective from the date of the petition." Once confirmed, the effective date of this Plan will be August 4, 2004. The court takes judicial notice that the "Bank prime loan" rate as published by the Federal Reserve for August 4, 2004 was 4.25%, *(http://www.federalreserve.gov/releases/ h15/20040809/).*[4] In that regard, the Debtors concede that the 2.5% interest rate in their Plan does not reflect the national prime rate and therefore does not comply with § 1325(b)(5)(B)(ii).[5] The court could sustain the County's objection to confirmation of the Plan and stop there, leaving the parties to resolve this issue through negotiation or further litigation. However, both parties have asked the court to assign an appropriate interest rate for the Tax Claim not only for the purpose of confirm-

**4.** The "national prime rate" referred to in *Till* is described as a rate, "reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower." 124 S.Ct. at 1961. However, there is no standard "national prime rate." Each bank sets its own prime rate "to reflect market demands and individual self interest in attracting new and retaining old customers." *See Wilcox Development Company v. First Interstate Bank of Oregon, N.A.,* 605 F.Supp. 592, 595 (D.Or.1985), *aff'd, rev'd in part on other grounds.* 815 F.2d 522 (9th Cir.1987) (holding that the process by which the defendant banks set their prime rates based on the prime rates of other major banks did not violate the Sherman Anti–Trust Act). Different media sources regularly publish a "prime rate" based on their survey of selected commercial banks and those rates may vary slightly at any given time. For example, the Debtors ask the court to accept a 4.5% rate based on information published in the Busi-

ness Section of the Bakersfield Californian, the local newspaper. Nationally recognized publications such as The New York Times and The Wall Street Journal publish a prime rate, but that information is not readily available without a subscription. The court generally accepts the "Bank prime loan" rates updated daily by the Federal Reserve and made available without cost to the public on the Internet at *http://www .federalreserve.gov/releases/h15/update/.* A link to this information is also available on this court's Internet site at *http://www.caeb.uscourts.gov.*

**5.** The Debtors apparently selected the treasury rate, or a similar published rate, in effect at the time they filed their bankruptcy petition. The treasury rate reflects the return available on short-term low risk debt. It is the federal government's cost to borrow money in the open market. *United States v. Welco Industries, Inc. (In re Welco Industries, Inc.),* 60 B.R. 880, 883 (9th Cir. BAP 1986).

ing this Plan, but also to serve as guidance for future cases.

### The "Risk Factor"

■ Once the prime rate is determined, *Till's* "prime-plus" formula contemplates an upward adjustment to compensate for "risk." The appropriate size of the risk adjustment depends on such factors as the circumstances of the estate, the nature of the security, and the nature and feasibility of the reorganization plan. 124 S.Ct. at 1961. The County urges the court to assign a risk factor which will bring the total interest rate payable on the Tax Claim up to the Plan's "imputed" rate of 10%.[6] The County argues correctly that the Supreme Court did not fix a risk factor in *Till;* the Court reversed and remanded the case to the trial court for that determination. 124 S.Ct. at 1962. Based thereon, the County contends that the (risk factor) field is still "wide open." The County argues that there is a substantial risk of Plan default based on (1) the Debtors' dependence on Mrs. Cachu's unemployment income, (2) the statutory delay imposed on the enforcement of tax liens under State law and the County's inability to immediately enforce its lien if the Plan fails, and (3) the five-year duration of the Plan. The Debtors contend in response that the County's risk is quite low based on the nature of the Tax Claim itself, despite any other factors. The court agrees with the Debtors.

The ultimate risk to any creditor in a commercial relationship is the risk of non-payment. In bankruptcy, there is also a certain risk resulting from the delay of payment and the cost associated with protection of the secured claim. However, some courts have noted that bankruptcy may actually benefit a secured creditor, "the risks inherent in a chapter 13 case are less than the risks associated with non-bankruptcy cases because the court's approval of a chapter 13 plan presumes the debtor's ability to complete the plan. In addition, if the plan is successful, the cost of collection is eliminated." *In re Mitchell,* 39 B.R. 696, 702 (Bankr.D.Or.1984), *citing In re Fisher,* 29 B.R. 542, 8 C.B.C.2d 628, 631–32 (Bankr.D.Kan.1983).

In the court's view, there is generally no other category of claims in any bankruptcy proceeding that has less risk of nonpayment than the real property taxes. Since the risk of nonpayment is very low, the cost of protecting and collecting the claim in a chapter 13 proceeding should not be substantial either. Real property taxes are authorized under Articles XIII and XIII A of the California Constitution. They are secured by a lien against the real property which, by State law, has priority over all other claims and liens against the property. Cal.Rev. & T.Code § 2192.1. The County will retain its lien under the Plan; the tax lien cannot be stripped down or subordinated. The Debtors must pay their postpetition property taxes as they come due. The County's secured claim will survive any downturn in the Debtors' economic situation, including complete failure of the Plan, conversion or dismissal of

---

**6.** The form chapter 13 plan used in this District imputes an interest rate of 10% for secured claims unless a different rate is specified in the plan. The form plan was adopted before the *Till* decision. The County's approach does not comply with the "prime-plus" formula prescribed in *Till* in that the County does not start with the prime rate and adjust upward for risk. The County's formula starts from a flat 10% rate and works backward with a proposed risk factor calculated as the difference between 10% and the prime rate. The County, in essence, wants the court to fix a flat 10% rate for real property tax claims regardless of the facts of the case and the variable nature of the "prime-plus" factors.

the bankruptcy case, and even foreclosure by a mortgage lender.

### Circumstances of the Estate

The County argues that the Debtor's dependence on Mrs. Cachu's unemployment income increases the risk of nonpayment of the Tax Claim. There is no evidence in the record regarding the nature of Mrs. Cachu's prior employment or the circumstances of her unemployment. Neither is there any evidence to suggest that Mrs. Cachu is not employable, or that her current state of unemployment is a long term situation. There is little evidence in the record regarding any other circumstances which compelled the Debtors to seek bankruptcy protection. The schedules report that the Debtors received a combined income of $52,686 in 2002. These numbers suggest that the Debtors have the ability to earn, and have actually earned, substantially more than they were earning at commencement of the case. The Plan contemplates a substantial increase in Plan payments beginning in the sixth month. Mr. Cachu's income has increased approximately $600 per month since the commencement of the bankruptcy. The first mortgage was to be paid off in January 2005 which increased the Debtors' disposable income by $300 per month. The court is not persuaded that the Debtors' financial circumstances at commencement of the bankruptcy create a substantial risk of nonpayment of the Tax Claim.

### The Nature of the Security

The County's collateral is the Debtors' family residence. It has substantial equity and the Debtors have every natural incentive to maintain and even improve their home, to the extent they are financially able to do so. Unlike automobiles, furniture, or other personal property, the value of residential real property does not substantially decrease in the absence of waste or some catastrophic event. There is no evidence before the court to support a conclusion that the Home will not retain at least its present value. Real property is always available for inspection and it cannot be removed from the jurisdiction of the court. Unlike the holders of personal property collateral, real property mortgagees frequently pay the real property taxes themselves to protect their liens in time of financial distress, particularly where there is a substantial equity to protect the mortgagee. The County does not, and cannot, argue that its collateral is at risk, or that its first priority Tax Claim is not adequately protected by the value of the Home.

### Duration and Feasibility of the Plan

The County argues that the Plan is not feasible based on the Debtors' financial condition. Pursuant to § 1325(a)(6), the court cannot confirm a chapter 13 plan unless, "after considering all creditors' objections and receiving the advice of the trustee, the judge is persuaded that 'the debtor will be able to make all payments under the plan and to comply with the plan.'" *Till*, 124 S.Ct. at 1962, *citing Associates Commercial Corp. v. Rash*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997).

The Plan does appear to be feasible, at least initially, based on the Debtors' Schedules I and J. The Trustee has not objected to confirmation of the Plan so the court may infer that he is satisfied with the Plan's feasibility. Further, a lower interest rate on the Tax Claim will actually improve the Plan's feasibility by reducing the monthly burden to the Debtors. The feasibility requirement in Code § 1325(a)(6), together with the cramdown provision in § 1325(a)(5)(B), "obligates the court to select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan." *Till*, 124 S.Ct. at 1962.

Feasibility of the Plan does not adversely affect the County's risk anyway. In the absence of a bankruptcy proceeding, the statutory interest rate payable on delinquent real property taxes is 18% per annum. Cal.Rev. & T.Code § 4103(a). The County concedes that the Debtors are not bound to pay the statutory rate through their Plan; the interest rate on its Tax Claim is determined by the Bankruptcy Code. *United States v. Camino Real Landscape Maintenance Contractors, Inc. (In re Camino Real Landscape Maintenance Contractors, Inc.)*, 818 F.2d 1503 (9th Cir.1987), (holding that the interest rate payable to the Internal Revenue Service under the debtor's chapter 11 plan is not fixed by 26 U.S.C. § 6621, but must comply with 11 U.S.C. § 1129(a)(9)(c)). It therefore follows that the County will actually benefit financially should the Debtors' Plan fail completely resulting in dismissal or conversion of the case to chapter 7. In that unfortunate event, the County will no longer be bound by the cramdown rate and it can enforce its tax lien for the full amount of the taxes due plus penalties and interest at the substantially higher statutory rate.

The County enjoys a level of protection in bankruptcy, by virtue of the nature of its Tax Claim, that is not available to any other kind of creditor. Real property taxes are an *in rem* liability that can only be assessed against the land. *Mutual Insurance Company of New York v. County of Fresno (In re D. Papagni Fruit Company)*, 132 B.R. 42, 44 (Bankr.E.D.Cal.1991), citing *City of Huntington Beach v. Superior Court of Orange County*, 78 Cal.App.3d 333, 340, 144 Cal.Rptr. 236 (1978). They *cannot* in any way be enforced as a personal liability against the land owner or any other entity. *Id.* Ergo, property taxes *need not* be enforced against the land owner either. Real property taxes cannot be discharged in bankruptcy. Postpetition real property taxes cannot be converted to an unsecured or administrative claim which inturn might become worthless upon conversion or dismissal of the bankruptcy case. *Id.* at 44–45. The postpetition assessment of ad valorem property taxes does not violate the automatic stay. 11 U.S.C. § 362(b)(18). They will ultimately be paid even if the taxing agency does not file a proof of claim. In the event that the Debtors sell the real property or refinance it through a commercial lender, the Tax Claim will typically be paid through the escrow as a condition of closing. If the Debtors sell the property without going through an escrow, the property tax liability will transfer with the land.

In summary, the court is not persuaded that the County bears any risk of nonpayment. Other courts have wrestled with this same issue and come to essentially the same conclusion, that the risk to a county for nonpayment of real property taxes in chapter 13 "is de minimis." *In re Williams*, 273 B.R. 834, 838 (Bankr. S.D.Cal.2002) (holding that the "market rate" of interest on a real property tax claim satisfied § 1325(a)(5)(B)(ii) based in part on expert testimony that the risk of total loss to the county was in the range of 0.01%). However, the Supreme Court did suggest in *Till* that the bankruptcy court is *required* to make some upward adjustment to the prime rate to compensate for what it recognized generally as "a greater risk of nonpayment than solvent commercial borrowers" typically posed by bankrupt debtors. 124 S.Ct. at 1961. In the absence of any evidence to illustrate what that "greater risk" is for real property taxes, the court finds and concludes, based on the facts of this case, that a nominal adjustment in the amount of one-half of one percent (0.5%) will adequately compensate the County for any hypothetical "risk" of nonpayment.

The County argues that there is a risk of delay associated with the chapter 13 bankruptcy because (1) the term of the Plan is five years, and (2) State law constrains the County's ability to collect the property taxes if they are not paid through the Plan.[7] In that regard, the County contends that it has a disadvantage compared to other secured creditors that can immediately take action to enforce their liens in the event the bankruptcy fails. In response to the first issue, the court notes that the prime rate adequately compensates the County for the time value of the deferred payments over the term of the Plan. The second source of delay is a matter of State law, it is inherent to the Tax Claim itself, and is not a function of the bankruptcy, the condition of the collateral or the Debtors' financial situation. The court is not required to place the County in the same position as all other secured creditors because, as explained above, the County is not in the same position as other secured creditors. An objective analysis requires only that the court "treat similarly situated creditors similarly." *Till*, 124 S.Ct. at 1960. The County must be treated the same under the Plan as all other holders of real property tax claims. The State law statutes that define the procedure for enforcement of real property taxes are universally applicable to all other counties in the State. The court cannot find that there is any compensable risk for the County based on State law restrictions or delays in the tax lien enforcement process.

The County argues that it necessarily incurs substantial administrative expenses and legal fees in connection with a bankruptcy proceeding and that those costs represent a risk of loss to the County. That may be true in a particular case where the County is required to actually file some pleading and/or appear in court. However, a great majority of the chapter 13 cases in this court, which involve the payment of real property taxes, result in little or no apparent work for the affected counties, other than the filing of a claim and review of the chapter 13 plan. The County has offered no evidence regarding the cost it incurs to process a property tax claim in a chapter 13 bankruptcy proceeding. Viewed cumulatively, a risk adjustment in the range of 0.5% on all property tax claims administered through the chapter 13 trustee should substantially compensate the County for any additional administrative cost imposed by the bankruptcy filings themselves.[8]

### Conclusion

Based on the foregoing, the County's objection to confirmation of the Debtors' chapter 13 Plan is SUSTAINED in part and OVERRULED in part. The interest rate which the Debtors propose in their Plan does not comply with 11 U.S.C. § 1325(a)(5)(B)(ii) based on the *Till* test. Neither does the 10% interest rate which the County demands. The court finds and

---

7. The County must first declare a tax default in the year following the delinquent tax year. Cal.Rev & T.Code § 3371. The taxes must be in default for five years before the County can publish a notice of intent to sell the property. Cal.Rev. & T.Code § 3361(a).

8. The court cannot, for obvious due process reasons, adjudicate the risk adjustment for property tax claims in future chapter 13 cases coming before this or any other court. The

*Till* Court was clear that the risk adjustment is a function of the circumstances of each case and the parties have a right to an evidentiary hearing on the issue. 124 S.Ct. at 1961. However, the County did request this ruling as "guidance" for future cases. Given the relatively small dollar amounts involved, the court anticipates that there will be little litigation of this issue by the County in future cases, at least in this court.

concludes based on the facts of this case that the proper cramdown interest rate for the County's Tax Claim under the "prime-plus" formula is a combination of the prime rate in effect at commencement of this case, 4.25%, plus a risk adjustment of 0.5%. The Debtors shall submit a separate confirmation order with interest payable on the Tax Claim at 4.75% per annum.